COMMONWEALTH vs. JOSE M. ARANA.

Plymouth. November 3, 2008. - February 13, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Rape. Indecent Assault and Battery. Evidence,* First complaint, Fresh complaint, Judicial discretion, Relevancy and materiality. *Practice, Criminal,* Jury and jurors. *Jury and Jurors.*

Discussion of the principles of the "first complaint" doctrine, which governs the admission of out-of-court statements of a sexual assault complainant. [219-221]

At the trial of indictments charging the defendant with rape, assault with intent to rape, and indecent assault and battery, the judge erred in admitting, as first complaint evidence, testimony regarding successive complaints made to the first complaint witnesses [222-223], testimony that one complainant had repeated her account of the incident to another witness [223-224], and testimony that served only the impermissible purpose of shoring up the credibility of one complainant against the defendant [227-228]; where the central issue at trial was the credibility of the complainants, the combined errors entitled the defendant to a new trial [228-229].

At the trial of indictments charging the defendant with rape, assault with intent to rape, and indecent assault and battery, the judge acted within his discretion in admitting testimony describing one complainant's demeanor at the police station shortly after the incidents in question, where such evidence was highly relevant to a contested issue, namely, whether the complainant's accusations were fabricated to provide a basis for the civil lawsuit that her parents subsequently brought against the defendant [224-226]; further, the judge did not err in admitting testimony concerning the circumstances and timing of police involvement in the case, as such evidence was an integral piece of the Commonwealth's response to the defendant's theory that the complainants and their parents were motivated to pursue criminal charges to support their civil lawsuit against the defendant, and that the police were complicitous in this effort [226-227].

A criminal defendant failed to demonstrate that the circumstances of a trial judge's dismissal of a juror after the third day of testimony warranted a new trial. [229-230]

Discussion of the limits, at the retrial of indictments charging the defendant with rape, assault with intent to rape, and indecent assault and battery, on the Commonwealth's lengthy presentation of medical and forensic evidence. [230-232]

INDICTMENTS found and returned in the Superior Court Department on September 24, 2004.

The cases were tried before *Charles M. Grabau*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert F. Shaw, Jr.*, for the defendant.

*Mary E. Lee*, Assistant District Attorney, for the Commonwealth.

*Anthony D. Mirenda, Ara B. Gershengorn, Jennifer A. Cardello & Lydia Watts*, for Victim Rights Law Center & others, amici curiae, submitted a brief.

*Julieann Hernon*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

BOTSFORD, J. A jury in the Superior Court convicted the defendant on seven indictments: one charging rape of a child with force, G. L. c. 265, § 22A; one charging assault with attempt to commit rape, G. L. c. 265, § 24; two charging the lesser offense of indecent assault and battery on a person who has attained the age of fourteen years, G. L. c. 265, § 13H; and three charging delivering of liquor to a person under twenty-one years of age, G. L. c. 138, § 34.[1] On appeal, the defendant asserts that a repetitive pattern of evidentiary errors, in violation of the "first complaint" doctrine set forth in *Commonwealth* v. *King*, 445 Mass. 217 (2005), cert. denied, 456 U.S. 1216 (2006) (*King*), infected his trial with unfair prejudice. He also asserts that the judge abused his discretion in allowing excessive and irrelevant testimony from the Commonwealth's experts and in dismissing one juror in the middle of trial. We granted the defendant's application for direct appellate review.

---

[1] The jury acquitted the defendant on six indictments: three charging rape of a child with force; one charging indecent assault and battery on a person who has attained the age of fourteen years; and two charging drugging a person for sexual intercourse. Two indictments, each charging rape of a child with force, were nol prossed.

At the conclusion of the Commonwealth's evidence, the judge reduced two charges of rape of a child with force to the lesser included offenses of indecent assault and battery on a person who has attained the age of fourteen years (as indicated above, the jury found the defendant guilty of these charges). The judge also allowed the defendant's motion for a required finding of not guilty on one indictment charging rape of a child with force. In sum, the defendant initially was charged on sixteen separate indictments. He was convicted on seven of them.

For reasons that will be explained in this opinion, we conclude that errors were made throughout the trial that could have influenced the jury's verdicts on the charges of rape, assault with attempt to rape, and indecent assault and battery. Accordingly, we reverse those judgments of conviction. We find no basis for reversing the defendant's convictions on charges of delivering liquor to a person under twenty-one years of age and affirm those judgments.[2]

We set forth the facts that could have been found by the jury, based on the Commonwealth's evidence and consistent with the jury's verdicts. We reserve additional details of the trial for discussion in the context of the issues raised by the defendant's appeal. On July 28, 2004, the complainants, Betty and Marie,[3] stayed overnight at the home of one of Betty's friends, Ruth,[4] the daughter of the defendant. At the time, Betty was fifteen years of age and Marie, who is Betty's sister, was fourteen years of age. Ruth's friend, Michelle, who was fifteen years of age, also was at the Arana home. The defendant was the coach of a soccer team on which Betty, and occasionally Marie, played. The defendant's wife was estranged from the defendant. Because she was in France at the time, the defendant was staying in the home to care for Ruth and her four siblings.[5]

Early in the evening, the defendant left the house and returned with a bag that contained Mike's Hard Lemonade and Smirnoff's liquor. The defendant gave the liquor to Betty, Marie, and Michelle, and the three girls began drinking. Later that evening, the defendant joined the girls in the basement of the home for a drinking game called Beirut, in which ping pong balls are thrown into plastic cups of beer. When a ball lands in a player's cup, the player must drink the beer. Betty and Michelle were on one team and the defendant and Marie were on the other. Betty drank most of the beers[6] for her team, and Betty and Marie

---

[2] The defendant's claim of error relating to the dismissal of the juror logically applies to the charges of delivering liquor to a person under twenty-one years of age, but as discussed in part 2 of this opinion, *infra*, that error by itself would not warrant reversal of the convictions. The defendant, in any case, has raised no specific challenge to these judgments of conviction.

[3] *Betty* and *Marie* are pseudonyms.

[4] A pseudonym.

[5] Four of the Arana children play no role in this case.

[6] Testimony of Betty, Marie, and Michelle was inconsistent as to whether

became drunk. Marie observed her sister being clumsy, falling, and acting "obnoxiously loud." She observed the defendant acting "childish, like us, just kind of laughing like it was normal [and] okay." Ruth and Michelle went upstairs to bed, leaving Betty and Marie to finish the game with the defendant. When the game ended, Betty went up to the main floor of the home. Marie and the defendant followed.

Marie "had no control over her speech" and was "clumsy." She became upset, and the defendant advised her to calm down and eat something. She sat down on a couch in a small living area that was part of the kitchen, ate a cheeseburger that the defendant had prepared, and watched television. The defendant sat down on the couch next to Marie, who was "tired" and "dizzy." The defendant, who was acting casually and not "like an adult at all," suggested that they should get Betty upstairs to bed. The defendant then left the room.

Betty, meanwhile, after playing the drinking game, also felt dizzy and found it hard to stand up.[7] She lay down on the living room couch. The defendant came into the living room and began to kiss her on the lips. He lay on top of her and put his hand up her shorts. His finger went inside her vagina.[8] He carried her upstairs and put her down on the bed in the master bedroom and again began to kiss her on the lips.[9] Betty could not remember many details. She testified, "[E]verything was kind of blurry

---

the game they played was with beer or another type of liquor. The jury were aware that a refrigerator in the basement of the Arana home may have contained beer.

[7]Betty's mother testified that Betty spoke with her from her cellular telephone at 12:30 A.M. on the morning of July 29, 2004. She testified that her daughter sounded normal and that nothing about the telephone call indicated that Betty had been drinking or was having a problem with the defendant.

[8]Marie testified that, from her vantage point on the couch in the kitchen, she could see the defendant lean over her sister, and kneel by her sister's stomach. She crawled into the living room (because she "wasn't capable of walking") and stood up behind the couch. Betty was lying on her back on the couch with her arms beside her head and her eyes shut. Marie asked the defendant what he was doing, to which the defendant smiled and replied that he was just talking to Betty. Marie then asked, "Why don't you just come back in the other room and leave [Betty] alone?" The defendant responded, "I'll be there in a minute." Marie then went back to the couch in the kitchen and sat down.

[9]Marie testified that, after the defendant took Betty upstairs, she herself went upstairs to look for her sister. She could see the defendant and Betty

and I was still really drunk." The defendant reached his hand up Betty's shorts, put his fingers in her vagina and asked her whether "it felt good." She did not respond because she was "scared" and "didn't know what to do." The defendant then put his mouth on Betty's genitalia. He quietly asked her whether she "wanted to have sex with him" and began to remove her shorts. Betty said, "No." She grabbed her shorts to pull them up. She then remembers falling asleep.

When the defendant returned downstairs, he suggested that he and Marie go the basement "because there's a bed downstairs that I can pull out." Marie agreed. After falling down some of the basement stairs (which made him laugh), the defendant pulled out the basement couch into a bed and told Marie to lie down. The defendant removed Marie's shorts and underwear and began to coax her to have sex. He took his shorts partially off and knelt on the bed so that Marie could see his penis. He began to lie on top of Marie so that his penis touched her thighs. Marie said "no." At that point, the defendant suddenly stopped and pulled up his shorts. He stated, "This is weird, I'm your soccer coach, I'm a dad, but I'm also human." The conversation then turned to soccer, and Marie felt relieved. Hearing a thump and her sister's voice from upstairs, she put on her shorts and underwear and went upstairs.

Betty had come down from upstairs and was sitting on the stairway. She wanted to clean up the basement, because she was worried that the defendant's wife would be upset on her return from France if there was a mess and evidence of drinking in her house. The defendant got a trash bag and helped Betty clean the basement. After a little while, he stated that "we should just go to bed; it's really late and you have to get up early." The defendant helped Betty upstairs and then helped Marie upstairs. They all slept in the bed in the master bedroom: Betty on one side, Marie on the other, and the defendant in the middle.[10]

through the partially opened door of the master bedroom, but awareness of what was happening in the bedroom escaped her: the information "didn't click." After using the bathroom, she walked into the master bedroom and told the defendant to go downstairs because Betty should be sleeping. The defendant, who had his back to the door, jolted upright and said, "I'll be there in a minute." Marie went downstairs.

[10]The Commonwealth's evidence also supports a different sequence of the

The alarm went off at 6 A.M. Marie went downstairs first. She was thirsty, "exhausted," and "had a pounding headache." Betty woke up and found the defendant in the room with her. He kissed her and asked whether she would like to shower. Betty declined and went into Ruth's room to find fresh clothes to put on. Downstairs in the kitchen, the defendant asked Betty whether she was "mad," and she responded, "No." He then asked whether they could "keep it between the two of them," and she responded, "Yes." The defendant handed Marie a brace that she had been wearing on her arm, and gave her a hug and a kiss. He said, "I had a good night."

Betty and Marie's mother picked up her daughters and took Betty to summer school. Later that day, Betty received a voice message from the defendant on her cellular telephone stating that he had had a good time and that he wanted to make sure she had gotten home and to school. One or two days later, Ruth sent a voice mail message to her father in which she stated: "I know what you did and I don't want to talk to you again." The defendant responded in a voice mail message, "I'm sorry, I made a mistake." The defendant's message further indicated to his daughter that he had been drunk and he did not know what he was doing.

In August of 2004, Betty and Marie's parents filed a civil lawsuit on behalf of their daughters and themselves against the defendant and his wife in the Superior Court, claiming damages.

With the above outline of facts (that the jury could have found) in place, we consider the defendant's claims of error.

1. In *King*, 445 Mass. at 241-247, we announced a new doctrine to govern the admission of out-of-court statements of a sexual assault complainant. This doctrine, known as "first complaint," "reflects a contemporary understanding of information that will permit jurors to make a fair assessment of a sexual assault complainant's credibility." *Id.* at 237.[11]

---

events that occurred that evening. According to Betty's testimony, she and the defendant cleaned the basement together before she lay down on the living room couch, and before the defendant kissed her lips and touched her vaginal area (digitally and orally) in the living room, and again in the master bedroom. Betty's testimony did not reference Marie's whereabouts in the Arana home at all, between the time of the drinking game and the time that their mother picked them up in the morning.

[11]Massachusetts Guide to Evidence § 413 (2008-2009) reflects the first

We articulated in *King* the following principles of the first complaint doctrine. First, there is no requirement of "promptness" or "freshness." "[T]he timing of a complaint is simply one factor the jury may consider in weighing the complainant's testimony." *Id.* at 242. Second, only one complaint witness, where feasible the first told, is permitted.[12] "Permitting a single first complaint witness to testify will accomplish the primary goal of the doctrine, which is to refute any false inference that silence is evidence of a lack of credibility on the part of rape complainants." *Id.* at 243. Third, under the first complaint doctrine, the complainant, as well as the first complaint witness, may testify to the details of the complaint itself and also why the complaint was made at that particular time. "Thus, information from the complainant (often unknown to the first complaint witness) explaining the timing of the complaint, her or his motivation for disclosing the assault to the particular person told and in the particular circumstances, and the manner in which the complainant made the disclosure, may be essential to the jury's understanding and appreciation of the first complaint testimony." *Id.* at 246. Finally, the first complaint witness also may testify to the circumstances surrounding the complaint. "By 'circumstances,' we mean that the witness may testify to his or her observations of the complainant during the complaint; the events or conversations that culminated in the complaint; the timing of the complaint; and other relevant conditions that might help a jury assess the specific defense theories as to why the complainant is making a false allegation." *Id.* Our goal in shaping the permissible contours of first complaint testimony was, and remains, "to give the jury as complete a picture as possible of how the accusation of sexual assault first arose." *Id.* at 247.

The scope of the first complaint doctrine is not without limits. It does not, of course, prohibit the admissibility of evidence that, while barred by that doctrine, is otherwise independently

complaint doctrine set out in *Commonwealth* v. *King*, 445 Mass. 217, 218-219, 241-248 (2005), cert. denied, 546 U.S. 1216 (2006) (*King*), and clarified in *Commonwealth* v. *Murungu*, 450 Mass. 441, 445-448 (2008). See *Commonwealth Stuckich*, 450 Mass. 449 (2008); *Commonwealth* v. *Lyons*, 71 Mass. App. Ct. 671 (2008).

[12]Clarification of this aspect of the rule is provided in *Commonwealth* v. *Murungu*, 450 Mass. at 445-446. See Mass. G. Evid., *supra*.

admissible. See *Commonwealth* v. *Montanez*, 439 Mass. 441, 456 (2003) (Sosman, J., concurring) ("Obsession with the strictures imposed on [first] complaint testimony should not blind us to the fact that [first] complaint is not the only basis for admitting such evidence"). See also *Commonwealth* v. *Lyons*, 71 Mass. App. Ct. 671, 674 n.4 (2008).

Against this backdrop, we briefly summarize the first complaint testimony in this case and consider the defendant's multiple claims of error.

John McCarthy (Jack) was designated as Betty's first complaint witness. Betty testified that, on the day following the assaults, she called Jack (a friend and neighbor) on the telephone and asked whether they could go for a walk. Betty testified that she was "concerned" and "confused" when going to meet Jack. She testified that she was worried about her friend Ruth, worried about getting into trouble for drinking, and worried about what her parents would think. She testified that she told Jack "a little bit" of what happened, and that Jack advised her to go to the police station.

Jack testified that Betty was "clearly upset," "crying," "shook up," and "distraught." He testified that during their walk, Betty asked him whether it was rape if someone digitally and orally "pleasured her." He testified that she then told him that "it happened at the Aranas' home"; "it happened to her"; and the defendant had done it.

Christopher Kerrigan (or Chris) was designated as Marie's first complaint witness. Marie testified that a few days after the assault, she spoke to her friend Chris on the telephone. She further testified that she told him that there had been drinking at the Arana home, and that the defendant had touched her. Marie testified that she felt that she "had to tell somebody"; she "didn't know what to do"; she "had done something wrong"; and Chris was "the only person [she] trusted."

Chris testified that Marie had called him on the telephone late one night and told him that she had been sexually abused by her soccer coach at his home after he had bought them "booze." He described Marie's demeanor as "upset," "crying," "need[ing] help," and "sad."

The judge instructed the jury, as directed by *King*, 445 Mass.

at 247-248, contemporaneously with the first complaint testimony of each witness and again during the final instructions. The defendant raises no claims of error with respect to the testimony described above, nor could he, for there is no question that the testimony was properly admitted as "first complaint" testimony.

The primary thrust of the defendant's appeal is that the judge improperly admitted additional evidence that, the defendant alleges, constituted "ongoing and egregious violations" of the first complaint doctrine, and that "poisoned" the trial proceedings with "erroneous and highly prejudicial" testimony. We first resolve the defendant's specific claims by assessing whether the challenged testimony, viewed in the context in which it was offered, strayed beyond the permissible boundaries of the doctrine.[13] We next discuss the potential prejudice that could have accrued to the defendant from errors that occurred. In recognition of the doctrine's relative newness, and in light of mistakes made in this case, we then clarify pertinent elements of the first complaint doctrine in order to provide further guidance.

(a) After Jack testified about Betty's first complaint, the prosecutor elicited from Jack testimony that he had had a second conversation with Betty before finally convincing her to go to the police station with him; Jack was not asked, and did not provide, details about the contents of this second conversation. This testimony drew no objection.

After Chris testified about Marie's first complaint, the prosecutor, over repeated objections, elicited testimony from Chris indicating that he spoke to Marie several times in the days following her initial telephone call to him, "about what happened that night at her coach's house." Indeed, Chris testified (without providing further details) that he and Marie thereafter "talked nightly on the phone."

The testimony described above was not admissible as first complaint evidence. In *Commonwealth* v. *Murungu*, 450 Mass. 441 (2008), and *Commonwealth* v. *Stuckich*, 450 Mass. 449 (2008), we clarified that, in circumstances where a complainant

---

[13]The defendant points to seventeen instances of first complaint violation that occurred during the testimony of ten Commonwealth witnesses. We have grouped the seventeen alleged violations for purposes of discussion.

makes successive complaints to the first complaint witness, the initial complaint is the only evidence admissible as first complaint. See *Commonwealth* v. *Murungu, supra* at 447 n.9. See also *Commonwealth* v. *Stuckich, supra* at 456-457 & n.9. The trial in this case took place in June of 2007. The judge, of course, did not have the benefit of guidance provided by either the *Murungu* or *Stuckich* opinions, both released in January of 2008. Permitting Jack and Chris to testify as to subsequent complaints, however, was error.

(b) Over the defendant's objection, Betty testified that on the afternoon after the assault, she told Michelle what had happened the night before. She testified that she and Michelle then "talked to [Ruth]." Betty described her own feelings at this time as "confused" and "upset." Michelle, in turn, was permitted to testify, over objection, that she and Betty had a conversation alone, on July 29, about "[Ruth's] dad." She testified that Betty was acting normally, until their conversation, when she became a "little upset." Michelle testified, "I think she cried." Ruth also was permitted to testify to the fact of her conversation with Michelle and Betty. She testified that Michelle "was doing all the talking for" Betty, and that Betty "add[ed] in points here and there." Over objection, Ruth testified that the conversation was about "[m]y dad." In contrast to Michelle, Ruth described Betty's demeanor with the words "[not] a lot of emotion" and "monotone." According to Ruth, when Michelle told her what her father had done, Betty just stood and stared at her.

We agree with the defendant that this testimony was not admissible as first complaint evidence. The fact that Betty told Michelle and Ruth, even without the details of the telling, "is the equivalent of saying that she repeated her account of the incident, i.e., it allows fresh complaint testimony through the back door." *Commonwealth* v. *Stuckich*, 450 Mass. at 457. See also *King*, 445 Mass. at 243. The Commonwealth argues that the testimony was admissible for another legitimate purpose, namely, to set the stage for the introduction in evidence of the voice mail message (described above) from the defendant to his daughter. We do not find this argument persuasive. The voice mail message, admissible as an admission of the defendant, needed no explanatory stage setting. As we discuss *infra*, there may indeed be instances

when testimony that includes, or implies, the fact that a report was made will be admissible for a legitimate purpose other than to corroborate a complainant's testimony. See *King, supra* at 231-232. Here, however, there was no such legitimate purpose for the challenged testimony. "The testimony of multiple complaint witnesses likely serves no additional corroborative purpose,· and may unfairly enhance a complainant's credibility as well as prejudice the defendant by repeating for the jury the often horrific details of an alleged crime." *Id.* at 243.

(c) The next challenge requires us to consider whether evidence which was inadmissible as first complaint was nevertheless independently admissible in the judge's discretion on the basis of some other evidentiary principle. Betty testified that on July 29, 2004 (the day following the assaults), with Jack's encouragement, she and Jack walked to the police station. At the time, Betty testified, she did not want to say anything and did not know what she was going to do. She testified that she had a conversation with a police officer (Officer Steven Amado) and then went home with her parents, who had been called to the station by Officer Amado's supervisor, Lieutenant Lewis Chubb.[14]

Officer Amado testified that when he met with Betty and Jack on July 29, Jack did most of the talking. Over objection, he testified that Betty was "extremely scared"; "had been . . . crying"; was "very unsure"; and "seemed like she did not want to be there." After ten to fifteen minutes of questioning, Officer Amado testified, he still had not received any specific information from Betty, who was "[v]ery reluctant" and "not really informing me of anything." He understood her to be saying, however, that "some girl may have been sexually assaulted."

At no point in the trial did Betty testify that she told her mother or father of the assault. She did testify that, when her parents came to the police station on July 29, she did not want to say anything to them.[15] She testified, "I don't think I specifi-

---

[14]Lieutenant Chubb testified that he met with Officer Steven Amado on the evening of July 29, 2004, and then contacted Betty's parents. Over objection, he testified that Betty appeared "very upset" and "very anxious" to leave the station.

[15]On cross-examination, Betty agreed that she had telephoned her mother on the morning of July 29, and, although she spoke to her mother at that time, she did not tell her that anything was wrong.

cally told them what happened." Her mother testified that when she arrived at the police station, Betty was "hunched over"; was "holding herself"; and "wanted to leave." Her mother testified that she "never had seen [Betty] acting that way before."

The defendant argues that there was no valid justification for the prosecutor to elicit this testimony. According to the defendant, a reasonable juror would have inferred, not only that a report had been made, but that Officer Amado had deemed the report credible.

The Commonwealth's position, on the other hand, is that the testimony of both Officer Amado and Betty's mother, describing Betty's demeanor on the evening of July 29, was nonhearsay demeanor evidence relevant and necessary to bolster Betty's credibility in the face of the defendant's accusation that her story was fabricated. According to the Commonwealth, the *King* decision did not prohibit this type of demeanor evidence.

The testimony complained of here was the subject of a motion in limine, in which the Commonwealth asserted the testimony to be relevant to demonstrate that Betty was reluctant and scared when she went to the police station. At a hearing on the motion held at sidebar, the prosecutor argued to the judge that the testimony was necessary in this case to counteract the defense theory that the complaint was motivated by the opportunity of Betty and Marie's family to gain money from the defendant in a civil lawsuit.[16] The judge allowed the motion.

The judge was within his discretion to do so. Evidence of a victim's state of mind or behavior following a crime has long been admissible if relevant to a contested issue in a case. See, e.g., *Commonwealth* v. *Hudson*, 417 Mass. 536, 537 (1994); *Commonwealth* v. *Flynn*, 165 Mass. 153, 156 (1896). The jury were keenly aware, at this point in the trial, that Betty and Marie's parents had filed a civil lawsuit against the defendant.

---

[16]As noted previously, the parents of Betty and Marie filed the lawsuit in August of 2004, less than one month after the alleged abuse. The defendant's counsel mentioned the lawsuit in his opening statement, questioned witnesses regarding it, and focused on it in his closing argument. As most cogently articulated in the closing, the defense theory was that Betty and Marie were frightened about being punished for drinking alcohol, and made up the allegations of sexual abuse by the defendant in order to cover up or deflect attention from the drinking, and then the story eventually took on a life of its own, becoming the centerpiece of the parents' lawsuit for damages.

In the circumstances of this case, the challenged testimony about Betty's demeanor was admissible, not as first complaint evidence but as evidence relevant to a highly contested issue, namely, whether Betty's accusations were fabricated to provide a basis for the civil lawsuit that would shortly be brought by her parents against the defendant.[17] See *Commonwealth* v. *Montanez*, 439 Mass. at 456 (Sosman, J., concurring).

(d) Betty testified, over objection, that a few days after July 29, she returned to the police station and talked with an officer "about what happened that night." Officer Amado testified that this conversation took place on July 31 and, as a result of the conversation, a warrant issued for the defendant's arrest.

This testimony arguably informed the jury that a report was made by Betty to the police subsequent to her "first complaint."[18] Our decision here requires us to elaborate on our recent decision in *Commonwealth* v. *Stuckich*, where we considered similar testimony, but in a different context. In *Stuckich*, we reasoned that the "description of the investigative process" and the "fact that the Commonwealth brought its resources to bear on this incident" has "no relevance to whether the defendant in fact committed the acts charged, and the jury did not need to know how the complaint of abuse evolved into the case before them." *Id.* at 457. Thus, we excluded this testimony as violative of the first complaint rule.

We did not intend in *Stuckich* to imply that, unless a police officer is the first complaint witness, testimony concerning the circumstances giving rise to the police involvement in a sexual assault case will never be admissible as part of the Commonwealth's case-in-chief. In this case, defense counsel from the beginning had vigorously argued to the jury that certain aspects of the police investigation conducted in the days following Betty's

___

[17]The Commonwealth is to be commended for raising the demeanor evidence issue by means of a motion in limine. As a result, neither the defendant nor the judge was caught by surprise, and the defendant had time to make strategic choices on how best to present his defense. A judge, on request, should instruct the jury, contemporaneously with the testimony, as to its permitted limited purpose.

[18]Although there was no direct testimony of a formal complaint, we agree with the defendant that one may be reasonably inferred from testimony that, after Betty spoke to the police, an arrest warrant issued for the defendant.

report of sexual assault demonstrated bias and incompetence on the part of the police.[19] We conclude (as did the judge) that the circumstances, and timing, of police involvement in the case was relevant and admissible, not as first complaint, but as an integral piece of the Commonwealth's response to the defendant's theory that the complainants and their parents were motivated to pursue these charges to support their lawsuit, and the police were complicit in this effort. The testimony was properly admitted.

(e) Over objection, Marie testified that after Betty had gone to the police, and after Marie had spoken to Chris, she had a conversation in the living room of her home with her parents in which she told them of the sexual assaults.[20] She admitted that at the time she told her parents, she already had completed at home a written statement that she had given to the police, omitting any reference to the drinking or the sexual assaults. Marie testified that she had omitted these facts because she was "scared" of what would happen. After she told her parents, Marie stated, she provided the police with the details she had left out of her original statement.[21]

For reasons discussed in part 1 (b), *supra*, this testimony was inadmissible under the first complaint doctrine. Although no details of Marie's reports to her parents or the police were given, the testimony served only to inform the jury that, after writing a false statement for the police, Marie did nothing for one or two days, and then made a first complaint to Chris and repeated the

---

[19]For example, defense counsel brought out, during cross-examination of Betty, that the complainants were permitted to complete written statements from home, and, during cross-examination of Lieutenant Chubb, that the police had accepted as evidence underwear brought to the station by the complainants' father.

[20]Marie also testified that, around the time she told her parents of the assaults, her house was "kind of frantic" and her parents were "really worried [and] concerned." This testimony, to which the defendant objected, was not admissible under the first complaint rule or otherwise.

[21]The complainants' mother earlier was permitted to testify that she had received information about the events of July 28 and 29 from Marie and that, a few days after July 29, she had "a conversation" with Betty and then telephoned the police. This testimony accomplished nothing other than to convey to the jury that the complainants did, in fact, confide in their mother about the assaults and that their mother found their stories credible. In this context, the testimony was inadmissible. See *Commonwealth* v. *Stuckich*, 450 Mass. at 457.

complaint to her parents and to the police. The jury, at this point in the trial, were already aware of the timing and nature of police involvement in the case. The testimony (which underscores Marie's indecision as to whether to keep silent or tell) has no direct relevance to the civil lawsuit brought by Betty and Marie's parents, or to defense accusations of bias on the part of police. Rather, the testimony served only the impermissible purpose, in this type of case, of shoring up the credibility of a critical witness against the defendant.

(f) Because the errors discussed above drew objections from defense counsel, we conduct our review to ensure "that the error[s] did not influence the jury or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). We are unable to conclude that no prejudice occurred. The central determination before the jury was the credibility of the complainants. It is clear that the jury disbelieved a portion of Marie's testimony (not referred to in this opinion), because they acquitted the defendant on four of the charges that were based primarily on Marie's accusations. Had the jury not been permitted to hear Betty, Michelle, and Ruth testify as to their tearful conversation about "[Ruth's] dad" — testimony that improperly bolstered Betty's credibility — as well as the other erroneously admitted testimony, which, although specifically connected to Marie, may have indirectly enhanced the credibility of Betty, there is more than a slight possibility that the jury might have disbelieved some portion of Betty's testimony as well. The defendant is entitled to a new trial.

The following comments are in order. The first complaint doctrine is an evidentiary rule designed to give support to a complainant's testimony of a sexual assault in cases where the credibility of the accusation is a contested issue at trial. The doctrine seeks to balance the interest of a complainant (who, as here, may be still a child) in having her credibility fairly judged on the specific facts of the case rather than unfairly by misguided stereotypical thinking, with that of a defendant in receiving a trial free from irrelevant and potentially prejudicial testimony. The doctrine, however, is not intended to be used as a shield to bar the jury from obtaining a fair and accurate picture of the Commonwealth's

case-in-chief. If testimony, other than that specifically and properly designated as first complaint testimony, serves no purpose other than to repeat the fact of a complaint and thereby corroborate the complainant's accusations, it is inadmissible. If, however, after careful balancing of the testimony's probative and prejudicial value, testimony is found by the judge to be relevant and admissible for reasons that are independent of the first complaint doctrine, in the context of a particular case, it is within the judge's discretion to admit the testimony. In this way, the jury will be able to make a fairer and more accurate assessment of the Commonwealth's case.

2. In light of our conclusion that there must be a new trial, we address the issue of juror dismissal only briefly. At the end of the third day of testimony, the judge was informed that one juror believed that the last witness who had testified that day, Christopher Kerrigan (Chris), may have been coached during his testimony. The next morning, the judge conducted a voir dire of the juror and found the juror firmly convinced that Chris's testimony was influenced by body language (e.g., eye contact and head nodding) of a spectator sitting in the back of the court room.[22] The judge determined that the juror no longer remained impartial in the case, and, over the defendant's objection, concluded that the juror must be dismissed to avoid tainting the remainder of the jury. The defendant claims that the juror's dismissal was an error of constitutional magnitude that, effectively, stripped the jury of a juror on the ground that the juror's assessment of a witness's credibility differed from that made by the judge, thereby denying him a fair trial.

General Laws c. 234A, § 39, provides in pertinent part that "[t]he court shall have the discretionary authority to dismiss a juror at any time in the best interests of justice."[23] The judge determined that the juror's observation of (what the juror took to be) a coaching spectator was an extraneous influence. This was incorrect. This was not a situation where a juror is contacted

---

[22]The judge determined that the spectator was, in fact, Marie's boy friend.

[23]The statute also provides a judge with "authority to excuse and discharge an impanelled juror prior to jury deliberations after a hearing upon a finding of extreme hardship." G. L. c. 234A, § 39. The latter provision contemplates circumstances where a juror seeks dismissal for personal reasons.

outside of the court room by someone connected with the case. Nor was it one where a defendant is mistakenly brought into the court room in leg irons in the jury's presence or viewed by members of the jury in the lockup. See *Commonwealth* v. *Stewart*, 450 Mass. 25, 39 (2007). Rather, it was a situation where a juror observes and considers, as the juror is entitled to do, all aspects of the witness's testimony in order to assess his credibility — similar to a juror's consideration of a witness's quavering voice, or defensive body language, as a suggestion that the witness is not telling the truth.[24]

The defendant's request for a new trial on this issue is moot. We are not aware, however, of any cases of this or another court holding that the erroneous dismissal of a juror, before deliberations begin, requires a new trial. Because it would be impossible to know what impact, if any, the juror's opinion that Chris had been coached would have had on the juror's (or the jury's) ultimate consideration of the entire case, we have difficulty understanding how this matter could have "specially" prejudiced the defendant. See G. L. c. 234A, § 74 (no irregularity in discharging juror shall be sufficient cause to set aside verdict unless objecting party "has been specially injured or prejudiced thereby").

3. The defendant's final claim of error is based on the Commonwealth's lengthy presentation of medical and forensic evidence. The jury heard testimony from a hospital physician concerning her examination of the complainants on August 5, 2004, one week after the alleged sexual assaults, and her collection of sample swabs from different areas of their bodies. The jury also heard testimony from two Massachusetts State police laboratory chemists, one who tested the collected samples and certain articles of clothing worn by Betty and the defendant on July 28 and 29 for evidence of sperm, seminal fluid, saliva, and the

---

[24]Moreover, in questioning the juror as to his ability to be fair, the judge was, essentially, inquiring into the juror's assessment of the witness's credibility based on what the juror had observed in the court room. In doing so, the judge was close to intruding into forbidden territory. Cf. *Commonwealth* v. *Fidler*, 377 Mass. 192, 196 (1979) (juror testimony may be taken to establish existence of improper influence, but not role of improper influence on jury's decision). Cf. also *Commonwealth* v. *Connor*, 392 Mass. 838, 844 (1984) ("In dealing with all aspects of the problem of discharging a deliberating juror, the utmost caution is required to avoid invading the province of the jury").

second who attempted to detect an exchange of deoxyribonucleic acid evidence from the clothing. The bottom line of all this testimony was that no physical evidence was discovered that would tend to show that a sexual assault (or assaults) took place. A portion of the testimony, however, was dedicated to informing the jury that evidence of a sexual assault is nearly impossible to find after the passage of five days.

On retrial, it should be kept in mind that a patient's statement of how alleged injuries were suffered, or by whom inflicted, generally is not admissible in the Commonwealth, even if made to a physician. See *Commonwealth* v. *Howard*, 355 Mass. 526, 528-530 (1969). See also Mass. G. Evid. § 803(4) (2008-2009). Although physicians may testify as to statements of symptoms and conditions made to them for purposes of medical diagnosis or treatment, see *Commonwealth* v. *Comtois*, 399 Mass. 668, 675 (1987), such testimony must be relevant to a patient's medical treatment; testimony that merely recounts a physician's collection of evidence sought by police or others as proof that a crime has taken place does not qualify. See *Commonwealth* v. *De-Oliveira*, 447 Mass. 56, 64-66 (2006) (in context of *Crawford* v. *Washington*, 541 U.S. 36 [2004], distinguishing statements made to physician for medical purposes from those intended to assist in criminal prosecution). To avoid undue prejudice to the defendant, the judge must be careful to limit the length of testimony with an overriding theme that has, when repeated, limited probative value.[25] We emphasize once again, in accordance with our cases and consistent with what has been stated in this opinion, that to be properly admitted, any testimony containing an embedded report of sexual assault, other than the complainant's first complaint, must serve an admissible purpose other than to cor-

---

[25]Here, the parties could have stipulated to the fact that no evidence of a sexual assault was found. The Commonwealth then could have presented an expert (preferably someone who played no role in examining the complainants) to testify generally concerning circumstances, such as the passage of time, that would or could render it unlikely that evidence of a sexual assault would be expected to be found. The defendant, if he chose to pursue this issue, could have countered this testimony by presenting an expert of his own. In this way, needless prejudice to the defendant would be avoided and the jury would be provided with appropriate information on the issue whether sexual assaults could have taken place despite the lack of physical evidence.

roborate the complainants' testimony as to the specific assaults that (allegedly) took place.

4. The defendant's judgments of conviction of rape of a child with force and assault with attempt to rape a child, and his judgments of conviction of indecent assault and battery on a person who has attained the age of fourteen years, are reversed, and the jury verdicts are set aside and the case is remanded to the Superior Court. The defendant's judgments of conviction of providing liquor to a minor are affirmed.

*So ordered.*