NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-677

COMMONWEALTH

vs.

ZOILO BRACERO.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the Superior Court, the defendant stands convicted of aggravated rape of a child with a ten-year age difference, rape of a child with force, assault with intent to rape a child, indecent assault and battery on a child under the age of fourteen, and assault and battery by means of a dangerous weapon on a child under the age of fourteen. The jury acquitted the defendant on one charge of indecent assault and battery on a child under the age of fourteen. On appeal, the defendant claims for the first time that the trial judge erred by admitting hearsay testimony that the defendant beat the complainant, and by admitting testimony that unfairly corroborated the complainant's credibility. We discern no error and affirm.

Background.  The Commonwealth presented its case through four witnesses:  Amanda[1] (the complainant), Amanda's mother, a Department of Children and Families (DCF) investigator, and a police detective.

Amanda testified about her home life and the charged offenses.  Amanda initially lived with her mother, father, and four siblings.  DCF became involved with Amanda's family several years before the sexual abuse began.  Amanda's parents were constantly fighting.  Despite DCF involvement in the home, the children learned that the family motto was "everything that happened in the house, stays in the house."  Amanda's parents separated, and the defendant, Amanda's uncle, became "practically the person who ruled everything" in the home.  With the approval of Amanda's mother, the defendant administered physical punishment to the children by striking them with a belt or making them kneel on a sharp object.  Amanda's mother also struck the children using her hand.  The defendant began sexually abusing Amanda when she was nine and continued to do so until she reached the age of thirteen, when she disclosed the abuse.

Amanda testified about the process of her disclosure.  She told her best friend about the physical abuse, "the hitting, the

_____

[1] A pseudonym.

disrespect, the discipline" from her mother and the defendant, and she told another friend "about the physical abuse." She told these two friends that the defendant "disciplines her." The next day, Amanda told her school counselor and a DCF investigator "about the physical abuse." Two weeks after first speaking with the DCF investigator, Amanda contacted the DCF investigator and revealed "the sexual assault" and "[g]enerally" what happened.

The DCF investigator also testified. She became involved in the case to investigate alleged physical abuse by Amanda's mother and father and the defendant. After meeting with Amanda, the DCF investigator received a telephone call from Amanda. At this point, the trial judge appropriately provided a limiting instruction on first complaint testimony. The investigator then related Amanda's report that the defendant had been sexually abusing her since she was nine years old and threatened to "hurt her if she told anybody."

Discussion. On appeal, the defendant claims the trial judge erred by admitting (1) hearsay evidence that the defendant physically abused Amanda, (2) evidence that DCF took Amanda into custody, (3) evidence that the DCF investigator assessed the credibility of Amanda, and (4) evidence of investigative steps that buttressed Amanda's credibility. After a review of the

3

record, we discern no error and no substantial risk of a miscarriage of justice.

The defendant asserts that the trial judge admitted hearsay testimony about physical abuse "over objection" by counsel, but we read the record differently. When testifying about disclosures to friends about physical abuse in the home, Amanda started to relate statements that her friends made in response. Defense counsel objected, and the judge sustained the objection. A short time later, Amanda once again started to testify to what her friends said in response to her disclosures, and the judge sustained an objection. These objections were limited to the hearsay statements of the friends and not to Amanda's statements that are now the subject of this appeal. Because there was no objection to Amanda's statements, our review is limited to determining if there was an error that resulted in a "substantial risk of a miscarriage of justice." Commonwealth v. Freeman, 352 Mass. 556, 564 (1967).

There was no error here regarding hearsay testimony. The challenged testimony was admitted as part of the first complaint doctrine. The purpose of the first complaint doctrine "is to give the jury as complete a picture as possible of how the accusation of sexual assault first arose." Commonwealth v. King, 445 Mass. 217, 246-247 (2005). A complainant may testify "to the details of the first complaint" as well as "why the

4

complaint was made at that particular time." Id. at 245. Similarly, a first complaint witness may testify to the "circumstances surrounding the initial complaint" as well as "the events or conversations that culminated in the complaint." Id. at 246. The testimony of Amanda and the DCF investigator fell within the range of admissible evidence by outlining the brief chain of events that led to the ultimate disclosure of sexual abuse: Amanda told two friends about the physical abuse; the next day, Amanda told her school counselor and a DCF investigator about the physical abuse; and two weeks later Amanda contacted the DCF investigator and revealed "the sexual assault" and "[g]enerally" what happened. The limiting instruction cautioned jurors on the use of this evidence and obviated any potential prejudice. Notably, the disclosure of physical abuse did not mention details and did not focus on the defendant. Instead, according to Amanda's testimony, her report of physical abuse mentioned her mother as well as the defendant. According to the DCF investigator's testimony, she became involved in the case due to allegations of physical abuse perpetrated by Amanda's mother and father and the defendant. On cross-examination of the DCF investigator, the defense established that Amanda initially accused only her mother and father of striking all the children with a belt. Given the context and limited use of this testimony, as well as the

5

defense use of this evidence to impeach Amanda, there was no error and no substantial risk of a miscarriage of justice. Freeman, 352 Mass. at 564.

The defendant next contends that the judge erred by allowing evidence that "the Commonwealth (through DCF) took [Amanda] into its custody" and placed her "ultimately into foster care." Given the context of the testimony about DCF's role in Amanda's care, we discern no error.[2] On direct examination of Amanda, the prosecutor elicited testimony tending to show Amanda's bias. Amanda testified that DCF "put" her in "different programs" and "helped" her stay in college by "paying" for her education. Amanda also testified that she had not been back to her house since she disclosed the sexual abuse. This testimony was proper. So as to avoid the "dramatic impact" of having evidence of potential bias extracted from its witness on cross-examination, the Commonwealth may, on direct examination, inquire into possible bias of the witness. Commonwealth v. Young, 10 Mass. App. Ct. 410, 412 (1980). "Otherwise it might appear the prosecution is trying to conceal damaging information from the jury." Id.

---

[2] On cross-examination of the DCF investigator, defense counsel said, "I want to ask you some questions about foster care," but the investigator testified, "I'm not comfortable speaking to that, because that's not the type of job that I do."

6

Defense counsel did not object to this testimony, which was entirely consistent with the defense strategy of focusing on Amanda's credibility.  In her opening statement, defense counsel suggested the motive for Amanda to contrive a story about the defendant.  Amanda had a difficult home life, but after accusing the defendant, "she got to leave and she hasn't had to come back since."  In her closing argument, counsel once again emphasized that Amanda was unhappy in a dysfunctional home and "was able to walk out of [that] home after she made this accusation."  Contrast Commonwealth v. Calderon, 65 Mass. App. Ct. 590, 595 (2006) (improper for social worker to testify about steps department took to "seek custody of the victim").  Thus, there was no error or "substantial risk of a miscarriage of justice."  Freeman, 352 Mass. at 564.

We also discern no error related to the DCF investigator's testimony about her general duties.  The defendant argues that he was prejudiced by testimony that investigators "try to determine if the report is actually true."  The referenced testimony is taken out of context from a larger narrative.  The witness was not referring to Amanda's allegations as the defense now suggests but was referring to general procedures about reports of "child abuse and neglect":  "As an investigator, you get a report.  The report has, there's allegations of child abuse and neglect.  It has to involve a caretaker most times.

7

And it's our job to talk to collaterals -- meaning doctors, schools -- meet with the children, meet with the parents, see the home, and try to determine if the report is actually true or not. . . . [O]ur job is to gather information to either support the allegations of child abuse and neglect, or we gather information to unsupport the allegations of abuse and neglect." When read in context, the investigator testified to general duties concerning reports of abuse and neglect, not to a conclusion about whether Amanda had been sexually abused. See Calderon, 65 Mass. App. Ct. at 595 (permissible for witness to provide "background information about the social worker's duties and how she became involved in the case"). Therefore, the testimony did not create the "imprimatur of official belief in the complainant." Commonwealth v. Stuckich, 450 Mass. 449, 457 (2008).[3]

Finally, we disagree with the defendant's contention that the judge erred by admitting testimony of the DCF investigator and the lead police detective about the "investigative process." Citing language in Commonwealth v. Stuckich, 450 Mass. 449 (2008), the defendant contends that the testimony about the investigative process "unfairly corroborated" Amanda's testimony "by repeatedly telling the jury that the Commonwealth believed

_____

[3] We note that defense counsel elicited testimony from the police detective that the defendant was "arrested on these charges."

8

her."  Contrary to the defense claim on appeal, neither the DCF investigator nor the police detective testified that they believed Amanda.  The DCF investigator testified that she attended an interview with Amanda and spoke with the defendant.  The police detective testified that he was contacted by the DCF investigator, spoke to the defendant, and attended an interview with Amanda.  We discern no impropriety in the admission of this evidence about investigative steps, especially where the interaction of these two witnesses with the defendant was critical to establishing a foundation for identifying him in court.[4]  See Commonwealth v. Arana, 453 Mass. 214, 226 (2009) ("We did not intend in Stuckich to imply that, unless a police officer is the first complaint witness, testimony concerning the circumstances giving rise to the police involvement in a sexual assault case will never be admissible as part of the Commonwealth's case-in-chief").

Also, testimony about the police investigation is entirely appropriate to answer defense claims of an inadequate investigation.  See Arana, 453 Mass. at 226-227 (steps in police investigation admissible and relevant where defense theory implied police incompetent and biased).  Here, in her opening

_____

[4] Neither Amanda nor her mother could identify the defendant in court during trial in 2019, five years after the indictments issued.

9

statement, defense counsel pointed to the lack of physical, medical, and eyewitness testimony as a weakness in the Commonwealth's case against the defendant.  Through an extensive cross-examination of the police detective, defense counsel also established the police failed to question witnesses, collect physical evidence, prepare search warrants, and subject evidence to scientific testing.  To rebut the suggestion this was inadequate investigation, the Commonwealth was permitted to produce evidence about the investigative process to explain why such evidence might not have been gathered.  Arana, 453 Mass. at 227.  The evidence about the investigative steps taken here was proper as "an integral piece of the Commonwealth's response to the defendant's theory."  Id.

Judgments affirmed.

By the Court (Henry, Shin & Hodgens, JJ.[5]),

Joseph F. Stanton

Clerk

Entered:  April 13, 2023.

---

[5] The panelists are listed in order of seniority.