## COMMONWEALTH *vs.* PETER STUCKICH.

Norfolk. November 5, 2007. - January 16, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Practice, Criminal,* Instructions to jury, Voir dire, Argument by prosecutor, Cross-examination by prosecutor, Assistance of counsel, Sentence. *Evidence,* Consciousness of guilt, Fresh complaint, First complaint, Relevancy and materiality. *Indecent Assault and Battery. Child Abuse.*

At the trial of charges of indecent assault and battery on a child under fourteen years of age, a substantial miscarriage of justice requiring reversal of the defendant's conviction arose from a combination of the following errors: the judge's unwarranted instruction to the jury regarding consciousness of guilt [452-454]; her failure, under the circumstances, to hold an evidentiary hearing for purposes of designating the first complaint witness [454-456]; the admission in evidence of the complainant's testimony regarding others to whom she spoke regarding the assault, as well as details of the investigative process [456-457]; the introduction of an irrelevant and extremely prejudicial stipulation from a care and protection proceeding, along with the complainant's mother's testimony that at the care and protection proceeding, the defendant had admitted to sexually abusing the complainant [457-458]; and the prosecutor's improper attack on the defendant's character, requests that witnesses comment on the credibility of other witnesses, and improper suggestions of the defendant's concealment or consciousness of guilt in closing argument [458-459, 460]; however, the prosecutor's cross-examination of the defendant concerning his retention of an attorney, an area opened by the defendant's attorney on direct examination, was not improper [459-460].

This court declined to address the criminal defendant's claim that his counsel's strategic choice not to object to certain evidence at the trial of charges of indecent assault and battery on a child under fourteen years of age was manifestly unreasonable, where it was uncertain whether the defense strategy would be the same at a new trial. [460-461]

In reversing the criminal defendant's conviction of indecent assault and battery on a child under fourteen years of age, this court admonished against any improper considerations (such as conduct for which the defendant had neither been charged nor convicted) bearing on a sentencing decision in the event of a retrial. [461-462]

INDICTMENTS found and returned in the Superior Court Department on July 30, 2003.

The cases were tried before *Judith Fabricant*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert F. Shaw, Jr.*, for the defendant.

*Pamela Alford*, Assistant District Attorney, for the Commonwealth.

*Lisa J. Steele*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

COWIN, J. The defendant, Peter Stuckich, was charged with four counts of indecent assault and battery on his daughter, a child under fourteen years of age, between January 1, 1995, and December 7, 1997, and one count of rape of a child (also his daughter) by force between January 1, 1995 and December 7, 1997. A jury acquitted him of the rape charge and convicted him of the assault and battery charges. He was sentenced to a State prison term of from five to seven years followed by probation of twenty years. The defendant filed a timely notice of appeal in the Appeals Court and we granted his application for direct appellate review.

On appeal, the defendant makes several claims. He alleges that the judge erred by instructing the jury regarding consciousness of guilt. He contends further that the judge failed to conduct a voir dire to identify the first complaint witness; improperly permitted evidence that effectively served as additional "fresh complaint" testimony; and improperly admitted evidence from a prior care and protection proceeding. In addition, the defendant claims that the prosecutor improperly (a) attacked his character, (b) asked witnesses to comment on the credibility of other witnesses, and (c) argued consciousness of guilt based on the defendant's retention of legal counsel. The defendant maintains also that his trial counsel was ineffective for failing to object to the admission of an abuse prevention order against him that the defendant's daughter had previously obtained.[1] Finally, the defendant claims that the judge's sentencing decision was impermissibly premised on uncharged conduct. We reverse for the reasons set forth below.

---

[1] The defendant was represented by different counsel at trial.

*Background facts.* We recite the facts the jury could have found, reserving further details for discussion in conjunction with the specific issues raised. In April, 2000, the complainant, whom we will refer to as Nancy, wrote a letter to her high school guidance counselor, Barbara Horan, alleging that the defendant, Nancy's biological father, had sexually assaulted her over a period of years. The letter stated that Nancy had recently told her mother about the abuse, and that her mother had in turn spoken to Nancy's therapist, Mr. Rubin, who was "trying to get me [Nancy] to talk about it." After reading the letter, Horan had a conversation with Nancy, comforting her and informing her that Horan would need to file a report of an allegation of child abuse with the Department of Social Services (DSS), as required by G. L. c. 119, § 51A (§ 51A report). The following day, Horan and the principal of the school met with Nancy, who showed them a journal entry she had written two weeks earlier describing her feelings about the abuse. Horan filed a § 51A report with DSS. Nancy indicated to Horan that she was angry about the filing of the DSS report and that she "just wanted her parents to get a divorce and move on."

Shortly after Nancy spoke with Horan, she told her mother about the abuse,[2] and a family meeting was held to confront the defendant. The defendant left the family home after the meeting. Soon after, Nancy and her mother went to the district attorney's office for a sexual abuse intervention network (SAIN) interview regarding the abuse allegations. One of the officers present at the SAIN interview, Detective David Egy, then interviewed the defendant regarding the allegations. No formal charges were brought at that time.

The defendant and his wife were divorced at some point following the allegations of abuse.[3] The defendant obtained employment in Springfield, Illinois, and moved there.

In 2002, when Nancy turned eighteen, she obtained a restraining order against her father. She stated that she was "being threatened on the telephone" and "being followed." Nancy told

[2]The testimony is inconsistent with the content of Nancy's note to Horan. The note states that Nancy had recently told her mother about the abuse. This inconsistency and the problems created thereby are discussed *infra.*

[3]The record does not disclose the date of the divorce.

Detective Egy that she now wanted to proceed with the abuse allegations against the defendant, and Detective Egy resumed work on the case. A second SAIN interview took place, and Egy caused criminal complaints to be issued against the defendant in the District Court. In July, 2003, a grand jury found and returned indictments charging the defendant with rape of a child by force and indecent assault and battery on a child under fourteen.[4]

*Consciousness of guilt.* The defendant claims that there was no basis in the evidence to support a consciousness of guilt instruction. Detective Egy testified that, after complaints had issued against the defendant, Egy spoke with the defendant by telephone. The defendant was then living and working in Springfield, Illinois. Egy told the defendant that complaints had issued against him regarding the abuse allegations. The detective also stated to the defendant that he would "like him to get in touch with the district attorney's office [a]nd find out when he's [*sic*] going to be back if he's coming back."[5] The defendant said he would call Egy back or have his attorney do so, but Egy never heard from the defendant.[6] Over defense counsel's objection, the judge instructed the jury, based on the above testimony, that they "heard evidence suggesting that the [defendant] failed to have further contact with the police after the police contacted him," and that, if the jury believed that the defendant had failed to have further contact with the police, then they "may consider whether such actions indicate feelings of guilt by the defendant and whether in turn such feelings of guilt might tend to show actual guilt on those charges."

Defense counsel objected to the consciousness of guilt instruction by stating, "Given that it's such a close call, I think to give the consciousness of guilt instruction would by its very nature and by the very language contained within it, is very prejudicial . . . . I ask that the instruction not be given." While counsel

---

[4]As mentioned previously, the defendant was found not guilty on the indictment charging rape of a child by force.

[5]Despite the garbled syntax, we construe this statement to mean that the detective wanted the defendant to inform the district attorney if and when he was returning to Massachusetts.

[6]One year later, the defendant was taken into custody after the outstanding warrant for his arrest was discovered following a stop for a traffic violation.

could have stated the basis for the objection in more specific terms, it was sufficient to alert the judge to the fact that there was no evidence on which to base the instruction.

Consciousness of guilt instructions are permissible when there is an "inference of guilt that may be drawn from evidence of flight, concealment, or similar acts," such as false statements to the police, destruction or concealment of evidence, or bribing or threatening a witness. *Commonwealth* v. *Toney*, 385 Mass. 575, 584 & n.4 (1982). There was no such evidence in this case and no other evidence that supported a consciousness of guilt instruction.[7] Detective Egy, in his telephone conversation with the defendant, did not order the defendant to return to Massachusetts, report to the police, or restrict his travel. No notice of a court date was sent to the defendant, nor was the defendant informed that he must appear in court. The statement to a lay person that a complaint had "issued" is not meaningful and does not convey that any particular action is required. Nor did the statement that Detective Egy "would like [the defendant] to get in touch with the district attorney's office [a]nd find out when he's going to be back, if he's coming back" suggest any command. This is particularly the case given the fact that the telephone call occurred almost two years after the defendant had voluntarily relinquished his parental rights, see *infra*, and approximately three years after the initial complaint of abuse and investigation. That the defendant said that he would call Egy back or have his attorney do so, and that Egy never heard again from anyone, is not a sufficient evidentiary foundation to support the instruction.

Because the issue was properly preserved, we review to determine whether we can be certain that the improper instruction "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). There were no witnesses to the alleged abuse other than Nancy and the defendant. Although the details Nancy provided are horrific and the repetitive nature of the incidents especially disturbing,

---

[7]The Commonwealth does not maintain that there was any suggestion of flight or concealment by the defendant. The defendant testified that he left Massachusetts because he had no family left here and had received a job offer in Springfield, Illinois. There was no contradictory evidence.

the jury acquitted the defendant of the rape charge. Thus, to some extent, the jury did not credit Nancy. The instruction presupposed that there was evidence of consciousness of guilt; communicated to the jury that the judge believed that there was such evidence; and directed the jury to determine whether to credit it and, if so, how to apply it in their deliberations. We have concluded that there was no evidence that qualified as consciousness of guilt evidence. Thus, in a case that turned ultimately on Nancy's credibility versus that of the defendant, the instruction, with its implication that there was indeed evidence that the defendant had demonstrated consciousness of guilt, could well have affected the verdict. Even if this error, standing alone, might not be sufficiently prejudicial to require reversal of the convictions, in combination with other errors discussed *infra*, "[o]n the whole, we are left with the clear opinion . . . that there was a substantial risk of a miscarriage of justice." *Commonwealth* v. *Cancel*, 394 Mass. 567, 576 (1985). See *Commonwealth* v. *Santiago*, 425 Mass. 491, 503 (1997).

*First complaint.* The defendant argues that the judge should not have permitted Horan to testify as a first complaint witness. Prior to trial, the Commonwealth filed a motion in limine requesting that Nancy's letter to Horan, a journal entry, Nancy's initial conversation with Horan, and Nancy's subsequent conversation with Horan and the school's principal be admitted as first complaint evidence. However, Nancy's letter to Horan stated, "My mom did not know anything about this, but I recently told her. My mom told Mr. Rubin about this and he is trying to get me to talk about it."

At a nonevidentiary hearing on the motion, before the judge who later presided at trial, defense counsel objected on the ground that Horan was not the first complaint witness. The prosecutor represented that both Nancy and her mother had told the prosecutor that the April, 2000, letter to Horan was the first disclosure, and that neither Nancy nor her mother had memory of a disclosure prior to said letter. Defense counsel informed the judge that the 2000 SAIN interview report contradicted the Commonwealth's representations. That report stated that Nancy had said that, before speaking to Horan, she had made a "vague[]" report to "Mike" (a family friend living in the

household) in February, 2000, and also "did tell" her mother. Defense counsel said that Nancy reported that her mother "thought she was talking about a one time incident." In addition, the judge observed that Nancy's letter to Horan referred to Mr. Rubin ("My Mom told Mr. Rubin about this and he is trying to get me to talk about it"). Nevertheless, and without holding a voir dire,[8] the judge concluded that "the Commonwealth is permitted to have testimony from the person who the Commonwealth's evidence would show to be the first person that the victim disclosed to." Horan testified at trial as the first complaint witness.

Before ruling on the Commonwealth's motion in limine, the judge should have conducted a voir dire. Although it is common to rely on the representations of counsel in considering motions in limine, here the issue could not be resolved without an evidentiary presentation. The prosecutor represented that neither Nancy nor her mother recalled any disclosure prior to the letter to Horan, yet the letter plainly stated otherwise. Given this contradiction, there was no way to decide who was the first complaint witness without a hearing. It was essential to hear directly from Nancy and her mother to determine, inter alia, whether in fact they did not recall any discussion prior to the Horan letter, and if not, the meaning of the reference in the Horan letter to prior discussion with the mother and the mother's report to Mr. Rubin. Mr. Rubin was another potential witness who might have had relevant testimony. If he was a counselor of some type, as suggested by the record, and if he had been informed by the mother of the allegations, he may well have had notes regarding the date he received the information. Nancy's friend Mike could also have been called.

This case was tried very shortly after our decision in *Commonwealth* v. *King*, 445 Mass. 217 (2005), cert. denied, 546 U.S. 1216 (2006), and all involved were seeking to apply the new decision for the first time. Nevertheless, in the circumstances presented here, the designation of the first complaint witness clearly demanded the taking of evidence. We also comment on the fact that the Commonwealth sought admission of

---

[8]The defendant did not request a voir dire in the Superior Court, although he argues on appeal that the judge should have held one.

multiple items as the first complaint evidence, namely Nancy's letter to Horan, Nancy's initial conversation with Horan, an earlier journal entry, and Nancy's later conversation with Horan and the school's principal. If, in fact, the letter was the first complaint, that is the end of the matter. The letter would be the first complaint evidence and the further disclosures are not admissible as first complaint evidence.[9]

*SAIN and investigative process.* The defendant claims that, contrary to the first complaint doctrine, the judge improperly permitted the Commonwealth to introduce testimony regarding others to whom Nancy spoke regarding the assault. The defendant also asserts that details of the investigative process were improperly admitted. The judge ruled that Nancy could testify that she "told [her] mother [and] told Mike," but not the details of what she told them. The defendant maintains that this evidence created an impression that multiple people, including trained investigators to whom Nancy disclosed the abuse, found her allegations credible. Nancy testified that she described the abuse to her mother, to Mike, and to numerous people in the investigative process. Horan testified that she believed Nancy's allegations and filed a § 51A report with DSS. Nancy's mother testified that, after Nancy told her of the abuse, she "immediately engaged [her] daughter in[] counseling," and soon thereafter went to the district attorney's office with Nancy for an interview. Detective Egy described the SAIN interview procedure to the jury, and informed them that it consisted of a trained forensic interviewer and members of the police department and the district attorney's office. Most, if not all, of this evidence was admitted without objection.

At a retrial, the prosecutor should not be permitted to introduce any of this testimony, for it undermines the purpose of the first complaint doctrine recently enunciated in *Commonwealth* v. *King,* *supra.* In that case, we stated that "we will no longer permit in evidence testimony from multiple complaint witnesses, limiting the testimony to that of . . . the first person told of the assault.[10]

[9]If it were determined that the conversation with Horan (and not the letter) was the first complaint, the only evidence admissible as first complaint would be that conversation. See *infra.*

[10]But see *Commonwealth* v. *Murungu, ante* 441, 445-446 (2008), for excep-

The testimony of multiple complaint witnesses likely serves no additional corroborative purpose, and may unfairly enhance a complainant's credibility as well as prejudice the defendant . . . ." *Id.* at 242-243. Nancy's testimony in this case regarding whom she told (in addition to the first complaint witness) is essentially the same as permitting those other witnesses to testify. Although the witnesses were not called to recount the details, the fact that Nancy reported to them is the equivalent of saying that she repeated her account of the incident, i.e., it allows fresh complaint testimony through the back door. Repetition of the narrative tends to enhance the credibility of the complainant to the prejudice of the defendant. Nancy should not have been allowed to testify on direct examination, see *Commonwealth* v. *Murungu, ante* 441, 447-448 (2008), that she "told" her mother and "told" Mike, and told various other people, notwithstanding that the details of her conversations were omitted.[11]

The description of the investigative process suffers from the same infirmity. The fact that the Commonwealth brought its resources to bear on this incident creates the imprimatur of official belief in the complainant. It is unnecessary and irrelevant to the issue of the defendant's guilt, and is extremely prejudicial. To cite but one example, the fact that Horan was mandated to, and did, file a § 51A report establishes nothing other than an impermissible inference that Horan believed the complainant. It has no relevance to whether the defendant in fact committed the acts charged, and the jury did not need to know how the complaint of abuse evolved into the case before them.

*Care and protection stipulation and testimony of Nancy's mother.* The defendant maintains that the judge should not have admitted certain evidence from an April, 2001, care and protec-

tions to the first complaint doctrine.

[11]The governing principles when we decided *Commonwealth* v. *Montanez,* 439 Mass. 441, 445-446 (2003), permitted this type of reference to other complaint witnesses. These principles no longer control as a result of our adoption of the first complaint doctrine in *Commonwealth* v. *King,* 445 Mass. 217, 241-245 (2005), cert. denied, 546 U.S. 1216 (2006). The naming of people to whom the complainant spoke about the incident is akin to a parade of multiple complaint witnesses, because the jury are likely to assume, and reasonably so, that the complainant repeated the substance of her testimony to each person to whom she complained. Thus, the *Montanez* case, to the extent it permits such reference, is obsolete and is overruled.

tion proceeding at which the defendant, his wife, their attorneys, and Nancy were present. At this hearing, which was prior to the institution of the present criminal charges, the defendant voluntarily relinquished his parental rights to Nancy. At the trial here, over the defendant's objection, the judge admitted a document from the care and protection proceeding signed by the defendant and titled, "Stipulation of the Parties and Consent to Adjudication." The stipulation provided, inter alia, that the defendant "will not be permitted to be at the home of [Nancy's mother]," and that "[t]here will be no contact between [Nancy] and her father unless [Nancy] and her therapist request such contact. Such contact would only occur in a supervised setting." The stipulation also referenced DSS reports and reports from the "court investigator." Also admitted over objection was testimony from Nancy's mother concerning a statement that the defendant had made during the care and protection proceeding. The objected-to testimony from Nancy's mother was that, at a colloquy at the earlier proceeding, the defendant stated, in response to the judge's questions, that he understood why he was at the proceeding, and that the reason for the severing of parental rights was the "sexual abuse of his daughter."

The stipulation of the parties was not relevant. It concerned only parental rights and the defendant's decision not to contest his wife's custody of his daughter. There was no litigation or determination regarding the allegations of abuse. The stipulation was also extremely prejudicial. Its contents suggested clearly that he could not have unsupervised contact with his daughter because he had sexually abused her. The references in the stipulation to DSS reports and reports from the "court investigator" were prejudicial as well because they suggested official approval of the allegations. Further, the judge should not have allowed Nancy's mother to testify that at the care and protection hearing the defendant responded in a colloquy with the judge that he knew that the basis for the severing of his parental rights was "sexual abuse of his daughter." Contrary to the trial judge's ruling, this statement was not an admission of abuse. It was merely an acknowledgment by the defendant that his parental rights were being terminated because of the allegations of abuse.

*Prosecutorial improprieties.* The defendant argues that the

prosecutor improperly (a) attacked the defendant's character; (b) asked witnesses to comment on the credibility of other witnesses; and (c) inquired about the defendant's hiring an attorney. He claims as well that certain aspects of the prosecutor's closing argument were improper. The defendant alleges that the prosecutor attacked the defendant's character by eliciting testimony from Nancy's maternal grandmother, to which there was no objection, that the defendant did "[n]othing" around the house and "had a bad habit" of "just standing around and scratching himself, but not in the usual manner. He would put his hands in his pants and scratch." As the Commonwealth concedes in its brief, the grandmother's testimony was of "dubious relevance." It should not be admitted at any retrial.

In the same vein, the prosecutor, over objection, introduced the defendant's statement to Detective Egy that at one time he had two adult pornographic magazines in the house. The detective testified that the defendant said that he had "perhaps two magazines of a pornographic nature" and no longer even had those. The evidence was not relevant and it should not have been admitted.

The prosecutor asked the defendant several times whether Nancy "is lying about these allegations," and whether Egy was lying about the interview he had with the defendant in 2000. The prosecutor also asked Horan whether she believed Nancy's allegations. There was no objection to any of this testimony. As the Commonwealth concedes, the prosecutor should not have asked the defendant to comment on Nancy's credibility and that of Egy by asking the defendant if those witnesses were "lying." See *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707, 708 (1984). Similarly, the prosecutor should not have asked Horan whether she believed Nancy's allegations.

The defendant contends that the prosecutor improperly cross-examined the defendant concerning his retention of an attorney, whether the defendant paid for the attorney's services, and the contents of the attorney's advice to the defendant relating to answering the charges of abuse. There was no objection to these questions. On direct examination, the defense attorney had opened up this area by asking questions about the defendant's hiring of a lawyer and the attorney's advice about responding

to the charges. In this context, the cross-examination was not improper. See *Commonwealth* v. *Eason*, 427 Mass. 595, 598 (1998) (doctrine of verbal completeness justifies admission of all said during same conversation on same subject).

The defendant maintains that the prosecutor argued improperly in her closing argument in two respects. There was no objection to either remark. The defendant contends that the prosecutor should not have stated that the police were "able to track him down, find him in Illinois." Although there was evidence that the defendant had moved to Illinois and the. police had to take several steps to locate his telephone number, the police knew where he was. There was no basis in the evidence to suggest that the police had to "track him down." This expression suggests that the defendant attempted to conceal himself or otherwise evade police detection, and was thus a misstatement of the evidence. See *Commonwealth* v. *Fernette*, 398 Mass. 658, 666 (1986). The defendant also argues that the prosecutor should not have stated the following:

> "Detective Egy . . . said . . . 'There's a complaint against you here in Massachusetts.' And you heard from the defendant that he contacted an attorney, paid him money, a defense attorney, and then never called [Detective Egy] again, never came back to Massachusetts to answer the charges . . . ."

It was improper to suggest consciousness of guilt based on the conversation with Egy. See the discussion of consciousness of guilt, *supra.*

*Ineffective assistance of counsel.* The defendant maintains that his trial counsel was ineffective for not objecting to evidence about Nancy's obtaining an abuse prevention order against her father in August, 2002 (approximately four years after the alleged abuse had ended), and to admission of Nancy's complaint of domestic abuse, Nancy's affidavit, and the order itself. When questioned by the judge, the defense attorney stated that the lack of objection was the result of a strategic decision. The familiar criteria set forth in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), are applicable. Furthermore, "[w]here, as here, the claim is that defense counsel committed a tactical error, the

defendant must demonstrate that defense counsel's tactical judg-
ment was manifestly unreasonable." *Commonwealth* v. *Finstein*,
426 Mass. 200, 203 (1997). Because the argument is that defense
counsel's strategic choice was manifestly unreasonable, and we
do not know whether the strategy will be the same at a new trial,
we do not address the issue at this time.

*Sentencing.* The defendant contends that the judge's sentenc-
ing decision was based on conduct for which the defendant had
neither been charged nor convicted. The indictments on which
the defendant was convicted allege indecent assault and battery
occurring for a period of three years, January 1, 1995, through
December 7, 1997. Testimony at trial referred to other uncharged
conduct during the preceding six years. The prosecutor recom-
mended a sentence of from seven to ten years followed by
probation for life. She acknowledged that such a sentence ex-
ceeded the recommendation of the Superior Court sentencing
guidelines, but stated that the length was justified because the
defendant's abusive conduct continued "for a period of ten
years. So in being equal, I guess the defendant should be
sentenced for a period of seven to ten years." The judge imposed
on the defendant a sentence of from five to seven years in pri-
son, followed by twenty years of probation. She "agree[d] with
the Commonwealth that [the defendant's conduct] warrants a
sentence substantially above the guidelines because of the re-
peated nature of the conduct, the long period of time over which
the conduct occurred and because of the particularly manipula-
tive nature of it as established in the testimony, which . . .
makes it perhaps more damaging to a young child than other
kinds of offenses that fall into the same statutory category."

A defendant cannot be punished for uncharged conduct, *Com-
monwealth* v. *Goodwin*, 414 Mass. 88, 93 (1993), because such
information is not "tested by the indictment and trial process.
Punishment is appropriate only for conduct of which the
defendant has been charged and convicted." *Commonwealth* v.
*Henriquez*, 56 Mass. App. Ct. 775, 779 (2002), *S.C.*, 440
Mass. 1015 (2003). However, if the uncharged conduct is rele-
vant and the report of it "sufficiently reliable," the conduct may
be considered at sentencing. *Commonwealth* v. *Goodwin, supra*
at 94. That is, the uncharged conduct may be considered as

bearing on "the defendant's character and his amenability to rehabilitation."[12] *Id.* at 93.

Here, the judge's statement that she considered "the long period of time over which the conduct occurred" is ambiguous. She may have been referring to the three years encompassed by the indictments or to the ten years the prosecutor had described. We are particularly concerned that no improper considerations bear on a sentencing decision in the event of a retrial and a conviction. See *Commonwealth* v. *Banker,* 21 Mass. App. Ct. 976, 978 (1986) (although ambiguous remarks of judge could have reflected proper considerations, resentencing required because "sentencing . . . must be free of any suggestion of impropriety on the part of the judge").

*Judgments reversed.*

---

[12]The uncharged conduct may be used to determine the type of punishment that should be imposed for the offense of which the defendant has been convicted. See *Commonwealth* v. *Goodwin,* 414 Mass. 88, 93 (1993).