## Commonwealth *vs*. David Ramsey.

No. 08-P-333.

Plymouth. September 10, 2009. - June 3, 2010.

Present: Mills, Green, & Meade, JJ.

*Incest. Evidence,* Medical record, First complaint, Relevancy and materiality, Hearsay, Credibility of witness. *Witness,* Corroboration. *Practice, Criminal,* Voir dire.

At the trial of an indictment charging incest, the judge erred in admitting in evidence hospital records containing allegations by the victim of rape and incest that were not redacted, where the records were inadmissible as first complaint evidence and no separate purpose for introducing them was apparent, and in any event, it would have been an abuse of discretion to admit them in toto without any redaction or competent jury instruction; further, given that a statement in the records was powerfully inculpatory, and a question from the jury regarding that statement reflected that the jury were focused on it, it could not be fairly concluded that the error did not influence the jury, or had but slight effect. [848-851] Meade, J., dissenting. Discussion of issues that might arise at the retrial of an indictment charging incest. [851-852]

Indictment found and returned in the Superior Court Department on February 28, 2003.

The case was tried before *Nonnie S. Burnes,* J.

*John V. Siskopoulos* for the defendant.

*Mary E. Lee,* Assistant District Attorney, for the Commonwealth.

Mills, J. A Superior Court jury convicted the defendant of incest, G. L. c. 272, § 17, and acquitted him of rape of a child, G. L. c. 265, § 23. He complains of multiple violations of the first complaint rule. He also asserts error in the exclusion of an alleged recantation, the improper questioning of a witness, and exclusion of a journal kept by Jane,[1] the complainant. Because

[1]A pseudonym.

of the erroneous admission of some portions of Jane's hospital records, we reverse.

*Background.*[2] Jane, born in 1985, was the Commonwealth's principal witness. She testified that the defendant, her father, sexually abused her, beginning between the ages of ten and twelve, while the family lived in Georgia. The family moved to Massachusetts in 1998 or 1999 and, except for a two-year period, the abuse continued. The Commonwealth's additional witnesses included Jane's former boy friend, Robert Fuller (agreed by the parties, pretrial, as the first complaint witness); Shannon Crosby, Jane's friend; two Wareham police officers; a social worker from the Department of Children and Families (DCF); and a treating social worker. Medical records from two hospitals, Tobey and St. Luke's, were admitted.

On November 17, 2002, Jane was taken to the two hospitals under circumstances described in the evidence as a suicide attempt.[3] She remained at the Tobey Hospital for about four hours, and was transferred to St. Luke's Hospital for psychiatric care, where she remained for five days. Jane's combined records from both hospitals consisted of more than eighty pages, and contained allegations Jane made to police officers and hospital staff that her father had repeatedly sexually abused her. The records include approximately twenty allegations of sexual abuse and conclusory statements of rape and incest, including the following: "[Jane] has been raped by her father since age [twelve]," "[i]ncest with father, long-term," and "she has been sexually abused by father since [approximately] age [twelve]." Additionally, the statement, "[f]ather admitted to this," appears in at least two separate places in the medical records.[4]

---

[2] The dissent narrates a version of the facts that "the jury were entitled to find . . . ." In the majority opinion, we recite the facts in order to form the predicate for our review of potential prejudice flowing from improperly admitted evidence.

[3] The evidence is conflicting as to what, if any, medications were ingested by Jane.

[4] In total there are over twenty instances of complaint in the hospital records. We note that the first complaint doctrine is applicable not only to the testimony of a live witness, but also to "any testimony containing an embedded report of sexual assault, other than the complainant's first complaint." *Commonwealth* v. *Arana*, 453 Mass. 214, 231 (2009). See *Commonwealth* v. *Monteiro*, 75 Mass. App. Ct. 489, 494-496 (2009).

The case was, as is often typical, a contest of credibility between the defendant and Jane. There was no physical evidence of the alleged abuse. The jury were permitted to propose written questions to witnesses during the trial,[5] and many detailed questions were placed to witnesses by the judge during, or at the immediate conclusion of, a witness's testimony. During jury deliberations, the jury submitted a question that revealed that they had focused their attention on a portion of the hospital records relating an admission by the defendant (the defendant denied having made any such admission). The jury reported deadlock after fifteen hours of deliberation, and were given the *Tuey-Rodriquez* charge.[6] Eventually the defendant was acquitted of rape, and convicted on the charge of incest.

*Discussion.* 1. *Admission of hospital records.* Prior to trial, the parties argued the admissibility of the hospital records. The defendant requested admission of two brief portions of the records that he argued was evidence of a state of mind corroborative of other statements Jane allegedly made recanting her allegations.[7] He argued for the exclusion of the remaining portions of the records because the medical records statute, G. L. c. 233, § 79, "does not get the Commonwealth around the requirements of [the first complaint doctrine as articulated in] *Commonwealth* v. *King*[, 445 Mass. 217 (2005), cert. denied, 456 U.S. 1216 (2006)]." The Commonwealth argued for the admission of both sets of records, in toto, relying on the medical records exception to the hearsay rule. The judge, who suggested that she agreed with the Commonwealth's position, reserved decision.

On the second day of trial, prior to the resumption of Jane's direct testimony, the judge heard further arguments as to the

---

[5]Accordingly, questions from the jury were directed by the judge to the defendant, the treating social worker, Jane, one police officer, and Jane's mother.

[6]See *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-3 (1851); *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973).

[7]The defendant sought to introduce the following statement that Jane made to hospital personnel: "I'm very sorry for what I've done. I don't know what I'm doing."

We disagree with the dissent's position that the defendant's desire to have recantation evidence admitted precludes his objection to other inadmissible portions of the hospital records.

hospital records. The Commonwealth again argued for their admissibility on the basis of the medical records statute, as records of medical treatment, and further contended that the first complaint doctrine did not apply. The defendant's attorney continued to argue for exclusion on the basis of *Commonwealth* v. *King* and "the balance of the rules of evidence." The judge ruled the records admissible, concluding that the first complaint doctrine did not preclude admission because the records were admissible on other grounds.

Before resuming direct examination of the defendant on the third day of trial, defense counsel requested reconsideration of that ruling and specifically requested excision of "the revelations of complaint that are listed in those records."[8] The request was denied.

The hospital records were not emphasized at trial.[9] However, a treating social worker testified to her examination of the medical records, and the judge, responding to a question from the jury, explained that all of the medical records would be sent to them. The judge instructed the jury to refer to the records during deliberations. Additionally, both attorneys referred to the medical records in closing.

Moreover, during their deliberations, the jury asked to be told the identity of the hospital employee who made the notations appearing on a particular hospital intake form. Examination of the record reveals that these notations referred to Jane's claim of sexual abuse, including the statement that "[f]ather admitted

[8]At this time defense counsel also objected to the admission of the hospital records on the grounds of relevance.

[9]The dissent suggests that the defendant intended to use the allegations appearing in the hospital records to support his challenge to Jane's credibility based on recantation. However, the defendant's opening statement reflects that he intended to rely, and did principally rely, on the testimony of Jane's mother and grandmother to establish that Jane recanted.

In his opening, defense counsel's only reference to the medical records was that the jury "will have other information in the medical records that [they] will be able to look at," and then described Jane's statement discussed in note 7, *supra*. This fleeting comment went to Jane's state of mind and made no reference to the objectionable portions of the records. Moreover, the jury had before them other evidence that the father had been placed under arrest on the basis of accusations by Jane, thereby furnishing context for Jane's recantations to her mother and grandmother.

to this. Police called & fa[ther] placed under arrest."[10] Defense counsel acknowledged that he had overlooked this statement during his review of the hospital records and requested a curative instruction stating that the defendant "did not admit to these allegations." The judge refused to give this instruction on the basis that whether the father admitted to the allegations was a jury question. Instead, the judge instructed:

> "What I can say to you, though, is that this information that's written on here is information that came from [Jane], including this phrase, "father admitted to this." That is information that came from [Jane]. You probably understood that anyway. But just to make sure that you knew that the hospital didn't go out and do its own independent investigation before whoever it was wrote this wrote it."

Defense counsel noted his dissatisfaction with the adequacy of the curative instruction, and moved for a mistrial based on the prejudicial impact of the hospital records. The judge denied this motion.

On appeal, the defendant argues that the wholesale admission of Jane's medical records contained multiple complaint testimony in violation of the first complaint doctrine. We agree.

2. *Hospital records and the first complaint doctrine.* We begin our analysis by determining "whether the challenged testimony, viewed in the context in which it was offered, strayed beyond the permissible boundaries of the [first complaint] doctrine." *Commonwealth* v. *Arana*, 453 Mass. 214, 222 (2009). In this case, the records were not admissible as first complaint evidence. As discussed above, by pretrial agreement, Robert Fuller was

---

[10]The father's alleged admission, phrased in slightly different terms, appeared in two separate notations contained in the hospital records:

> "[Patient] disclosed being sexually assaulted by father since age of [twelve years]. Father admits to this and was placed under arrest. [Patient] reporting she is now concerned her mother is going to be mad because she has disclosed. [DCF] called into Tobey [emergency room] interviewed [patient] & now interviewing mother & other [siblings]."

> "[Patient] disclosed that she has been repeatedly sexually assaulted by father since age [twelve]. Father admitted to this. Police called [& father] placed under arrest [DCF] also called to interview [patient] her mother & her siblings."

the designated first complaint witness. The hospital records, which contain additional complaints by Jane of abuse by her father, written statements of hospital personnel reiterating the complaints, and conclusory statements of rape and incest, were inadmissible as first complaint evidence.

Our next task is to determine "whether evidence which was inadmissible as first complaint was nevertheless independently admissible in the judge's discretion on the basis of some other evidentiary principle." *Id.* at 224. However, the mere "existence of a potential alternative evidentiary basis for the admission of repetitive extrajudicial complaint evidence does not guarantee its admissibility." *Commonwealth* v. *Monteiro*, 75 Mass. App. Ct. 489, 494 (2009). Instead, if "after careful balancing of the testimony's probative and prejudicial value, testimony is found by the judge to be relevant and admissible for reasons *that are independent of the first complaint doctrine*, in the context of a particular case, it is within the judge's discretion to admit the testimony" (emphasis added). *Arana, supra* at 229. "The evidence . . . must serve a separate function, and must be of sufficient importance to a fair understanding of the Commonwealth's case." *Monteiro, supra* at 495.

The judge in this case evaluated the hospital records on various grounds. Pretrial she indicated that the records were likely admissible as an exception to the hearsay rule because they were made for purposes of diagnosis and treatment, concluding that the first complaint doctrine was a different exception to the hearsay rule. Later, in overruling the defendant's objection to the records during direct examination of Jane, the judge ruled that the records were admissible as statements made during treatment and thus were not barred by the first complaint doctrine. These rulings are incorrect as matters of law[11] because, as discussed above, the judge must first determine whether the testimony serves a purpose other than corroborating Jane's testimony and then weigh its probative and prejudicial value. *Arana, supra* at 229. The judge did not conduct such an inquiry in this case and, even more troubling, there does not appear to be a separate purpose for introducing the further evidence of

---

[11]We note that, at the time of trial in this case, the parties and the judge did not have the benefit of cases exploring the first complaint doctrine, such as *Commonwealth* v. *Stuckich*, 450 Mass. 449 (2008), and *Arana, supra.*

complaint contained in the medical records.[12] The medical records statute, which is merely a separate evidentiary principle, does not, on its own, constitute a separate purpose for admitting further complaint testimony. See *Monteiro, supra* at 495. Furthermore, even if there were a separate purpose for admitting the further evidence of complaint contained in the medical records, it would be an abuse of discretion to admit them in toto, containing the statements that they do, without any redaction or competent instruction to the jury. The error is preserved, and thus we review under the familiar principles of the prejudicial error standard. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).[13]

On this record, "[w]e cannot say that the judge's error in admitting the improper [evidence] was not prejudicial." *Ibid.*

---

[12]In *Arana, supra* at 227, further evidence of complaint was admissible in order to rebut the defendant's allegation that the complainant fabricated the accusations to provide a basis for a civil lawsuit. In *Commonwealth* v. *Kebreau*, 454 Mass. 287, 299 (2009), such evidence was admissible because the defense exploited discrepancies in the testimony of one of the victims and had "opened the door on cross-examination"; thus, "the Commonwealth was entitled to attempt to rehabilitate the witness." Here, the medical records were introduced prior to any cross-examination of Jane.

In *Commonwealth* v. *Dargon (No. 1)*, 74 Mass. App. Ct. 330, 336, further appellate review granted, 455 Mass. 1101 (2009), multiple complaint evidence was admissible because the defense strategy was a "cataloging of the numerous individuals the victim encountered, suggesting in essence that if the victim had been telling the truth, she would have told more of those" people. The defense strategy in *Dargon* manipulated the first complaint doctrine (because only the first person whom the victim told of the abuse could testify as to the allegation) and thus the Commonwealth was "permitted, within reason, to admit evidence of the victim's prior consistent statements." *Id.* at 337. That is not the situation in this case.

Additionally, the portion of the hospital records that was admitted in *Dargon* over the defendant's objection consisted only of the victim's detailed description of the sexual assault. *Dargon, supra* at 333. However, the records admitted in this case do much more. In addition to reiterating allegations of sexual abuse, they contain statements of hospital personnel repeating the allegations, conclusory statements of rape, and a diagnosis of incest. Furthermore, it appears that the records in *Dargon* were at least partially redacted. *Id.* at 333.

[13]No mention was made by either party or the judge of the prohibition in the medical records statute that "nothing therein shall be admissible as evidence which has reference to the question of liability." G. L. c. 233, § 79. See *Commonwealth* v. *DiMonte*, 427 Mass. 233, 242 (1998) (notations on hospital intake form stating that complainant had been "assaulted" should have been redacted); *Commonwealth* v. *Dwyer*, 448 Mass. 122, 137 (2006) ("statements bearing on the question of liability" and "ultimate conclusions" should be redacted).

The records contain overwhelming repetitions by various members of the hospital staff of the allegations of abuse.[14] In addition, the "central determination before the jury was the credibility of [Jane]." *Arana, supra* at 228. Again, as in *Arana,* the jury did not believe Jane's entire story because the defendant was acquitted on the charge of rape. "In a case such as this one, which turned on credibility, there is a particularly high probability of prejudice from the admission of duplicative complaint evidence." *Monteiro, supra* at 497.

The erroneous admission of the medical records, including the statement that "[f]ather admits to this and was placed under arrest," was powerfully inculpatory. The jury's question regarding this particular notation reflects that they were focused on it. Other questions from the jury during deliberations, questions posed by the jury to witnesses during trial, and the jury's deadlock after fifteen hours of deliberation persuade us that the jury were being extremely careful and that the case was very close. The statements contained in the hospital records, including both the multiple complaints by Jane and the father's alleged admission, should not have been before the jury, and served impermissibly to corroborate Jane's testimony in a case in which credibility was the central issue. We cannot fairly conclude "that the error did not influence the jury, or had but very slight effect" and thus the conviction must be reversed. *Flebotte, supra* at 353, quoting from *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. 437, 445 (1983).

3. *Other issues.* We briefly comment on other issues that may arise in the event of a retrial.

a. *Voir dire.* The defendant argues that the voir dire on first complaint was insufficient. In the event of a retrial, the judge and the attorneys will have the benefit of *Arana, supra,* and *Commonwealth* v. *Stuckich,* 450 Mass. 449 (2008).

b. *Testimony of Shannon Crosby.* Crosby, a friend of Jane, was permitted to testify that she went to the police to make disclosures in which Jane's complaint was embedded. The judge noted the testimony as "appropriate to set the context for why

---

[14]We are particularly troubled by the portions of the hospital records that state a diagnosis of "[i]ncest with father, long-term," the statement that Jane "has been raped by her father since age [twelve]," and the statement that "father admits to this and was placed under arrest."

[Jane] did what she did, why it goes, I think, to her credibility." In the event of retrial, the parties and the judge will have the benefit of *Arana, supra.*

c. *Exclusion of evidence of alleged prior allegations by Jane.* The defendant sought to admit evidence of, and cross-examine Jane about, a previous allegation of abuse against the defendant that Jane had allegedly made and recanted while the family was living in Georgia. The judge excluded the evidence, finding that the defendant's offer of proof was insufficient because there was no independent basis that it was a false allegation. There was no error. See *Commonwealth* v. *Hicks,* 23 Mass. App. Ct. 487, 490-491 (1987); *Commonwealth* v. *Costa,* 69 Mass. App. Ct. 823, 831 (2007). The narrow exceptions in *Commonwealth* v. *Bohannon,* 376 Mass. 90 (1978), do not apply.

d. *Jane's journal.* The defendant sought to admit an entry from Jane's journal, asserting that it constituted evidence that Jane intended to lie. The defendant's argument is so remote that the judge's refusal to admit the testimony could not have been an abuse of discretion.[15]

*Conclusion.* The admission of the medical records in toto violated the first complaint doctrine and was error requiring reversal of the judgment of conviction of incest. The jury verdict is set aside.

*So ordered.*

MEADE, J. (dissenting). If the defendant had been entitled to a perfect trial, I would comfortably side with the majority. But he was not. See *Commonwealth* v. *Lodge,* 431 Mass. 461, 476 (2000). Mistakes were made at this trial, which in my estimation does not separate it from many others, if any at all. While I agree with the majority's finding of error in the admission of the unredacted hospital records, I part company with them on the issue of prejudice. Although our difference is a matter of

---

[15]The defendant also argued that the judge should not have permitted the prosecutor to ask Jane, her mother, or her maternal grandmother about their failure to contact Jane following her accusations. The judge did not abuse her discretion in permitting the questioning, where it was relevant to the witnesses' bias.

degree, my view is that the defendant received a fair trial. Because I do not believe a new trial is required, I respectfully dissent.

1. *Background.* The facts of this case are as sad as they are ugly. The majority's truncated recitation of the events surrounding the hospital records fails to provide a sufficient picture of what occurred at trial. A full picture is necessary to determine if, and to what extent, the defendant was prejudiced by the admission of the unredacted hospital records.

a. *The Commonwealth's case.* The jury were entitled to find the following facts in support of the defendant's incest conviction. The victim, Jane,[1] is the defendant's biological daughter. She was born in 1985. When she was young, her family lived in Georgia while the defendant was in the Navy. While living in Georgia, when Jane was between ten and twelve years old, the defendant began sexually abusing her. He told Jane that he needed to "correct" her because he was afraid that she was becoming a lesbian and their family did not believe that was right. The abuse began with sexual touching and oral intercourse, and then continued to vaginal intercourse.

When Jane was thirteen or fourteen, the defendant retired from the Navy and moved his family to Wareham, where he continued his sexual abuse of Jane. The abuse occurred once or twice a week, usually vaginal intercourse but sometimes oral penetration as well. Although Jane's mother was often home during these episodes, she suffered from severe depression and slept a lot. Her mother would occasionally visit Jane's maternal grandmother in Connecticut, sometimes with Jane's younger sister. As Jane got older, she often stayed home with the defendant during these trips because she worked. On four or five occasions, the defendant brought Jane to a hotel in Middleboro, where he would perpetrate his incestuous conduct.

When Jane was fourteen, she began dating Robert Fuller, another high school student. They dated for two years. A few months into their relationship, Jane told Fuller about her father's sexual abuse, but asked him not to tell anyone. During her relationship with Fuller, Jane asked the defendant to stop sexually abusing her because Fuller wanted to marry her. The defendant agreed, but he also stopped talking to her. When Jane was

---

[1] A pseudonym.

about sixteen or seventeen, she stopped dating Fuller. Upon this occurring, the defendant reinitiated his sexual abuse of Jane. He told Jane that he did not want to stop because he cared for her, that it would hurt him to stop, and that he believed that there was nothing wrong with it.

Jane worked at a nearby nursing home where she met Dustin Harris, an African-American man, who was eight years her senior. Jane began dating Harris without her parents' knowledge because she thought they would not approve of an interracial relationship. On November 14, 2002, while Jane was at Harris's home, the defendant arrived. He was not happy. Jane went home with the defendant. When they got home, the defendant took out a gun that he had been carrying, removed the bullets, and put the gun away. He told Jane that he was unhappy with her and that he would tell her mother about Harris. Jane, wanting to convince the defendant not to tell her mother and to make him happy, had sexual intercourse with him.

On November 17, 2002, Jane and the defendant went for a walk on the beach near their home. The defendant was very disappointed in Jane. He did not like that she was dating Harris and he wanted her to stop. He also told her that he did not want to stop having a sexual relationship with her. Jane felt trapped, scared, and did not know what to do. In an attempt to kill herself, Jane went home and took a full bottle of pain pills and one-half of the defendant's heart medication. She sent a computer instant message to her friend, Shannon Crosby, in which she described her overdose. Jane went to Crosby's house, where she met Crosby and another friend, Ashley. Ashley's mother eventually brought Jane home, telling Jane's parents about the overdose. A few weeks before the November 17 suicide attempt, Jane had told Crosby that "something . . . was going on with her father." Crosby reported Jane's disclosure to the police on November 17. Crosby's report was not made at anyone's direction, but because she was worried about Jane.

Jane's parents took her to Tobey Hospital in Wareham on November 17. At the hospital, Jane was given medication that made her vomit. She was then brought to St. Luke's Hospital in New Bedford. On or after November 17, 2002, Jane disclosed the defendant's sexual abuse to various hospital staff members. Her hospital records contained handwritten notes (many of

which were barely legible) of her disclosures, including that the defendant had raped Jane for many years and that there had been long-term incest. The records also showed that Jane told hospital personnel that she had been "doing bad things," "lying to [her] parents," and that she was sorry for what she had done. Also at the hospital, after her mother and grandmother tried to convince her that the entire event had been a dream and attempted to get her to agree that she had lied, Jane recanted the allegations because they were being "pretty pushy" and she just wanted them to leave her alone. However, according to her mother and grandmother, Jane said she had lied because the defendant had forbidden her to date Harris. After her hospital stay, Jane had no contact with her mother and grandmother.

The police did not seize any clothing or bedding from Jane's parents' home because Jane had told them that she had washed everything because she felt dirty. The defendant denied any sexual relationship or conduct with Jane when he was interviewed by a Department of Children and Families (DCF) social worker. He told the DCF social worker that he believed that Jane had made the allegations because she was upset that he found out that Jane was dating an older man of a different race.

b. *The defense.* As set out in the defendant's opening statement, the defense was built around the assertion that Jane, an angry teenager, had manufactured her sexual assault claim at the hospital in revenge for the defendant forbidding her to date Harris (both of which occurred the same day), and that she recanted this allegation at the hospital. In support of this theory, the defense called a police officer who responded to the defendant's house on the day of the suicide attempt. According to the officer, Jane told him that she took an entire bottle of pain relieving pills and four nitroglycerin tablets because she felt that she had let her mother down and figured that they would be better off without her.

Jane's mother and grandmother testified that Jane said her allegations against the defendant were lies because of the argument she had with the defendant about Harris. Jane's mother admitted that she had complete financial dependence on the defendant and had no real employment skills of her own. The defendant testified that he counted the pills in his nitroglycerin

bottle and none was missing. He denied all the allegations of sexual abuse.

2. *Discussion.* a. *The hospital records.* The statute establishing the medical records exception to the hearsay rule, G. L. c. 233, § 79, "is not to be interpreted as rendering admissible all the contents of hospital records." *Bouchie* v. *Murray*, 376 Mass. 524, 528 (1978). Rather, § 79 makes admissible only those portions of records relating to "treatment and medical history." *Commonwealth* v. *Dwyer*, 448 Mass. 122, 136 (2006), quoting from G. L. c. 233, § 79. Conversely, medical records that include statements on the question of liability (or culpability) must be redacted. See Mass. G. Evid. § 803(6)(B) (2010).

Here, it was error for the judge, over the defendant's objection, to admit the hospital records without redacting handwritten phrases such as, patient "has been raped by her father since age [twelve]," patient "discloses being sexually assaulted by father," "father admits to this and was placed under arrest," "incest with father, long term," and patient was "sexually abused by father." See *Commonwealth* v. *Dwyer*, *supra* at 137. The error may also be viewed as a violation of the first complaint doctrine outlined in *Commonwealth* v. *King*, 445 Mass. 217, 241-248 (2005), cert. denied, 546 U.S. 1216 (2006). See *Commonwealth* v. *Stuckich*, 450 Mass. 449, 457 (2008). However, in either case, because the error was not structural, we must review for prejudice.

Because this was a nonconstitutional error, the judgment may stand if we are "sure that the error did not influence the jury, or had but very slight effect." *Kotteakos* v. *United States*, 328 U.S. 750, 764 (1946). Put another way,

> "if [we] cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . . [The question is] whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

*Id.* at 765. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 352-353 (1994); *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437,

445-446 (1983). Based on my review of the entire record, after pondering all that happened at the trial, and without removing the fact of the improper admission of the unredacted hospital records from the whole proceeding, I can say with fair assurance that the jury were not substantially swayed by the error, which at best, had a slight effect.

I base my view on several factors. First, the defense was built on the premise that the victim concocted the allegations in revenge for the defendant prohibiting her from dating Harris, who was African-American and eight years her senior. From the outset of the case, beginning with his motion in limine to admit certain of the victim's statements contained in the hospital records,[2] and as set out in his opening statement, the defendant planned to use the hospital records to show the victim had recanted the allegations. The defendant specifically sought the admission of a hospital record that was understood to be a recantation, and he told the jury that they would have medical records as further evidence of the victim's recantation.[3] Concluding with this same theme, in his closing argument, the defendant made specific reference to statements in the hospital records,[4] to explain why she made the allegations against the defendant. The portions of the records that should have been redacted were the actual allegations made in the hospital that the defendant argued had been recanted by the victim.[5] Without them, it would have been difficult for the jury to understand that the recantations

[2]When the defendant discussed the motion in limine with the judge, he argued that the victim's statements at the hospital, along the lines of "I'm very sorry for what I've done. I don't know what I'm doing," reflected the state of mind of someone who had made a false allegation.

[3]In his opening statement, the defendant told the jury that, "[i]n addition to the recanting through the [victim], you will have other information in the medical records that you will be able to look at. Statements that are also reflective of a state of mind of someone who has made a false allegation. Something like, I don't know what I am doing. Or, I feel bad about what I have done. I don't know what I am doing."

[4]The records contain the victim's statements to hospital personnel that she had been "doing bad things," "lying to [her] parents," and that she was sorry for what she had done.

[5]Contrary to the majority's view, I do not maintain that "the defendant's desire to have recantation evidence admitted precludes his objection to other inadmissible portions of the hospital records." See *ante* at note 7. Also contrary to the majority opinion, I do not suggest that "the defendant intended to use the allegations appearing in the hospital records to support his challenge

referenced the same allegations of rape and incest as those at trial. Instead, he would have had to establish the recantation by relying solely on the testimony of the victim's mother and grandmother, both of whom the jury could have understood to be biased in favor of the defendant because they had pressured the victim into recanting and because the defendant was the sole means of support for the victim's mother.

Second, I have no concern that the jury thought the improper notations were part of a hospital investigation or a report from the police because the judge specifically told the jury that these were comments made by the victim and no more, and specifically noted they were not the result of an investigation. This directive came in relation to the jury question inquiring as to who had authored the intake form, and the notation of the defendant's claimed admission. To this notation, the judge told the jury that this information came only from the victim, not from the defendant.[6] Indeed, the victim had testified that the defendant admitted to what he was doing, and that he did not want to stop. The curative instruction effectively removed from the jury's consideration any understanding that the defendant had admitted his crimes to hospital personnel.[7] See *Commonwealth* v. *Stokes*, 440 Mass. 741, 751 (2004) ("we presume the jury follow the judge's instructions"). Relatedly, the jury were never instructed that they could use the hospital records as evidence to assist them in evaluating the victim's credibility, see *Commonwealth* v.

to [the victim]'s credibility based on recantation." See *ante* at note 9. Rather, as I note from the very beginning of this dissent, I agree with the majority's finding of error. Instead, my view is that the defendant was not prejudiced by the unredacted remarks in the records.

[6]The majority's belief that the jury's question regarding the intake form indicates that the jury "focused" their attention on this record entry is purely speculative. See *ante* at 851. We cannot fairly say the jury "focused" on this topic, any more than we can say they were not focused on the three other questions they asked (on topics such as the victim's diary, the purpose of a medication, and the whereabouts of a police report), or on any question at all.

[7]Beyond mentioning the fact of the curative instruction, the majority opinion does not discuss (or deny) its mitigating effect. The majority opinion does correctly note that the judge told *counsel* that she would not instruct the jury that the defendant did not admit the allegations because the judge believed that was a jury question. Importantly, the majority opinion does not make it clear that the judge did not instruct *the jury* that whether the defendant admitted the allegations was an issue of fact for them to resolve.

*King, supra* at 248, because it was not admitted as corroborative complaint evidence.

Third, the defendant was charged with raping his own child. This is, to say the least, a startling allegation. The evidence at trial revealed the defendant to the jury as one who behaved more like a jealous boy friend than a father. His attempted excuses to the victim for his incestuous conduct, first that he was concerned about her sexual orientation and later that he was concerned that she was dating a man of another race, could only have made the evidence of his crime all that more compelling to the jury. As a result, I cannot conclude that the jury would have been further startled, impressed, or influenced, let alone "substantially swayed" by the content of the barely legible notations in the hospital records, which even the majority agrees were not emphasized at trial. In fact, these notations were precisely the same allegations that formed the basis of the indictments in this case, which were read to the entire venire when the defendant was set at the bar to be tried, and again after the jury were seated and sworn. This is precisely the reason the judge provided when she denied the motion for a mistrial. It is also significant that hospital records did not include information outside the scope of these charges. Contrast *Commonwealth* v. *Dwyer*, 448 Mass. at 136 (defendant prejudiced by unredacted hospital record that contained statements concerning the victim's sister, which implied that she, too, might have been abused by the defendant). Rather, the unredacted remarks in the hospital records were entirely cumulative of the indictments, and the very reason why the defendant was on trial. See *Commonwealth* v. *Braley*, 449 Mass. 316, 326 (2007) (the improper admission of cumulative evidence does not constitute prejudicial error).[8]

Fourth, the judge's charge on the incest indictment was favorable to the defendant. Even though the defendant's incest was alleged to have occurred between October 22, 2001, and November 14, 2002, the judge instructed the jury under the old incest

---

[8]It is also my view that the unredacted records did not have any effect whatsoever on the inconceivable if not fatuous defense theory that the nearly emancipated seventeen year old victim would attempt suicide and falsely accuse her father of raping her because he did not approve of whom she wished to date. My view is further supported by the fact, as set forth in part 2. b., *infra*, that it was Shannon Crosby, not the victim, who brought the circumstances of this case to the attention of the police.

statute, which restricted the crime to natural sexual intercourse with another in a prohibited line of consanguinity. However, that statute was only applicable to pre-May 1, 2002, allegations. See *Commonwealth* v. *Smith*, 431 Mass. 417, 422-424 (2000) (limiting incest to penile-vaginal penetration; other sexual activity excluded by incest statute). The current statute, G. L. c. 272, § 17, as amended by St. 2002, c. 13, would have covered a great deal more of the defendant's acts[9] that occurred between May 1, 2002, and November 14, 2002.

Finally, the jury did acquit the defendant of rape, which is some indication that the unredacted records had but a slight effect.[10] See *Commonwealth* v. *Sosnowski*, 43 Mass. App. Ct. 367, 372 (1997) ("difficult to find that the admission of the evidence caused prejudice" where defendant was acquitted on two of three indictments). In fact, the many references to "rape" in the records did not serve to corroborate the victim's credibility impermissibly, or at all because the jury acquitted the defendant of rape. The majority's view permits the defendant to use the first complaint rule as a shield when he did not achieve complete success. See *Commonwealth* v. *Arana*, 453 Mass. 214, 228-229 (2009).

Based on these reasons, when viewed against the backdrop of the entire trial, which includes the improper admission of the unredacted hospital records, I am without grave doubt and can say with fair assurance that the jury were not substantially swayed by the error. To the extent there was any resulting effect on the jury occasioned by the hospital records, it was slight. See *Kotteakos* v. *United States*, 328 U.S. at 765.

b. *Shannon Crosby.* The defendant also claims that Shannon Crosby's testimony violated the first complaint rule. In light of

---

[9]In addition to punishing sexual intercourse with another within a prohibited line of consanguinity, the current version of G. L. c. 272, § 17, also applies to those "who engage in sexual activities with each other, including but not limited to, oral or anal intercourse, fellatio, cunnilingus, or other penetration of a part of a person's body, or insertion of an object into the genital or anal opening of another person's body, or the manual manipulation of the genitalia of another person's body."

[10]Coupled with this is the fact that the incest indictment alleged that the offense occurred when the victim was between sixteen and seventeen years old, whereas the rape indictment covered a greater range, when the victim was between twelve and fifteen years old.

the Supreme Judicial Court's decisions in *Commonwealth* v. *Arana, supra,* and *Commonwealth* v. *Kebreau,* 454 Mass. 287 (2009), both decided after the trial in this case, I disagree.[11]

Prior to trial, the Commonwealth moved in limine that it be permitted to elicit through Crosby, without detail, that a few weeks before the victim's suicide attempt, the victim told Crosby what had happened and that after the suicide attempt, Crosby went to the police. The purpose of this testimony would be to show that it was Crosby, and not the victim, who initiated the police investigation. The defendant objected and claimed that this was impermissible under the first complaint rule. The judge deferred ruling on the matter until Crosby testified.

At trial, Crosby testified, over the defendant's objection, that she was worried about the victim, and that a few weeks before her suicide attempt, the victim told her that "something . . . was going on with her father." On the same day as the victim's suicide attempt, Crosby went to the police, not at anyone's direction, but because she was worried about the victim. Thus, as promised, this testimony showed that it was Crosby and not the victim who initiated the police investigation. There were also no details or specification as to what the "something" was that was occurring between the victim and the defendant.

In *Commonwealth* v. *Arana, supra* at 224-225, the Commonwealth brought a motion in limine to permit a police officer and the victim's mother to describe the victim's demeanor at the police station on the day after the assaults. The Commonwealth maintained that this evidence demonstrated that the victim was reluctant and scared when she reported the assault, which was necessary to bolster the victim's credibility in the face of the defendant's accusation that her story was fabricated. The defendant objected to this evidence, and claimed that this was inadmissible additional complaint evidence. *Id.* at 224. The Supreme Judicial Court disagreed, and held that "the circumstances, and timing, of police involvement in the case was relevant and admissible, not as first complaint, but as an integral piece of the Commonwealth's response to the defendant's theory that the complainants and their parents were motivated to pursue these

---

[11]The majority does not reach this issue, and leaves it for resolution at a retrial should there be one.

charges to support their lawsuit, and the police were complicit in this effort." *Id.* at 227.

Here, as stated above, the defense was built around the assertion that the victim was angry and had manufactured her sexual abuse claims at the hospital in revenge for the defendant forbidding her to date Harris (which occurred the same day), and that she recanted this allegation at the hospital. Crosby's testimony that it was she, and not the victim, who went to the police was necessary to bolster the victim's credibility in the face of the defendant's accusation that her story was fabricated. In any event, given how vague Crosby's testimony was, there is no reason to conclude that the jury would have understood that the "something" that occurred was additional complaint evidence any more than it was further evidence of the discord between the victim and the defendant due to the victim's relationship with Harris.

Finally, even if Crosby's testimony could be construed as additional complaint evidence, it would have been admissible. In *Commonwealth* v. *Kebreau, supra* at 288-289, the court held that the first complaint doctrine "permits testimony from two first complaint witnesses in circumstances similar to those here, where each witness testifies to disclosures made years apart concerning different periods of time and escalating levels of abuse, which constitute different and more serious criminal acts committed over a lengthy period."

Here, Fuller testified to the victim's report of the defendant's assaults from when she was ten or twelve years old, and which continued until she was fourteen. During the two-year period that the victim dated Fuller, the defendant stopped his incest with the victim. At age sixteen or seventeen, the victim stopped dating Fuller, and the defendant reinitiated his abuse. Crosby's would-be complaint testimony related to the second period of abuse. Although there were escalating levels of abuse during the years in question, Crosby's testimony did not reveal any details to assess whether the assaults from the two periods differed. Nonetheless, the disclosures were made years apart, there was no evidence that there was any overlap in the reports, and there was no "piling on," the primary vice in sexual assault prosecutions that led to the creation of the first complaint rule. See *Commonwealth* v. *King, supra* at 235, 245. At bottom, whether

Crosby's testimony is viewed through an *Arana, supra,* or *Kebreau, supra,* lens, there was no error.

I respectfully dissent.