SANTANA, COMMONWEALTH vs., 101 Mass. App. Ct. 690

 
 COMMONWEALTH vs. CLAUDIANO SANTANA.

101 Mass. App. Ct. 690
 April 14, 2022 - September 14, 2022

Court Below: Boston Municipal Court, Brighton Division
Present: Vuono, Rubin, & Walsh, JJ.

 

No. 21-P-413.

Indecent Assault and Battery. Alien. Evidence, First complaint. Practice, Criminal, Argument by prosecutor.

At a criminal trial, no prejudice arose from the prosecutor's improper questioning of the defendant about his immigration status, where the jury could have reasonably inferred that the defendant's immigration status was in question based on his testimony that the victim's father threatened to have him deported (i.e., the prejudicial impact of the prosecutor's question was mitigated by the fact that the jury, based on the defendant's testimony, already had more than an inkling that the defendant was living in the country illegally), where the judge gave a forceful limiting instruction, where the jurors themselves indicated that they were not prejudiced against the defendant due to his immigration status given that they acquitted him on the charge of threat to commit a crime, and where the issue was not raised with other witnesses or mentioned in the prosecutor's opening statement or closing argument; further, although this court recognized that there could well be bias toward non-English speakers generally and thus the prosecutor should not have drawn attention to the issue, the prosecutor's questioning of the defendant's assertion that he could not speak English and her implication that the defendant in fact could speak English did not create a substantial risk that any language-related bias created a miscarriage of justice, where the victim's parents (two of the prosecution's key witnesses) had resided in the country longer than the defendant and also did not speak English; moreover, a police detective's improper testimony describing the steps that he took in the investigation did not create a substantial risk of a miscarriage of justice, where the detective did not express any indication that he believed the victim, and where the defendant benefited from cross-examining the detective to argue that his investigation was inadequate; furthermore, the absence of an investigator of the Department of Children and Families was the result of the defendant's strategic decision not to call the investigator as a witness and not the judge's ruling that the investigator could not testify as an expert witness; finally, although the prosecutor should not have reminded the jury in her closing argument that the police obtained an arrest warrant at the conclusion of the investigation, the reminder did not create a substantial risk of a miscarriage of justice. [693-700] Rubin, J., dissenting.

Complaint received and sworn to in the Brighton Division of the Boston Municipal Court Department on March 28, 2017.

 Page 691 

 The case was tried before Mark H. Summerville, J.

 Kathleen A. Kelly for the defendant.

 Paul B. Linn, Assistant District Attorney, for the Commonwealth.

 WALSH, J. A Boston Municipal Court jury convicted the defendant of three counts of indecent assault and battery on a child under the age of fourteen, G. L. c. 265, § 13B. [Note 1] On appeal, the defendant contends that the judge erred by (1) allowing the Commonwealth to question him about his immigration status and ability to speak English, (2) admitting multiple first complaint testimony in violation of the first complaint doctrine, and (3) excluding evidence of the victim's mental health history. He also claims that the prosecutor improperly vouched for the victim's credibility during closing argument. For the reasons that follow, we affirm the judgments.

 Background. We recount the facts as the jury could have found them, reserving certain details for later discussion. The victim was between the ages of seven and nine when the defendant sexually assaulted her on three occasions. During this time, the defendant lived with the victim's family, which consisted of her mother, father, and a younger sister. In addition, two or three uncles resided with the family. [Note 2] Although the defendant was not related to the victim, he had two daughters with the sister of the victim's mother, and the victim referred to him as her uncle.

 The victim testified that the first sexual assault occurred one night when her parents were asleep. The defendant entered the victim's bedroom, grabbed her by the wrists, and took her into his room. He proceeded to lay her down on the floor next to a computer playing music. The two moved to the defendant's bed, where the defendant began to touch the victim's leg. After some time, he got up, handed the victim money, and ordered her not to tell her parents or else he would "do something" to them. Despite the defendant's threat, the victim told her mother several days later. However, as the victim said at trial, her mother did not 

 Page 692 

believe her.

 The second sexual assault occurred in the defendant's bedroom. The defendant touched the victim's genital area over her clothing, and then, as the victim lay on the defendant's bed unclothed from the waist down, the defendant touched the outside of her vagina with his penis. At the same time, he grabbed her ankles and tried to spread her legs apart. On a third occasion, when the victim and defendant were alone in another room, the defendant exposed his penis to the victim and "shoved" her head into it. The victim testified that the incident happened quickly and that she got up immediately and walked out of the room. [Note 3] 

 The victim did not speak of the second and third assaults until 2017, when she once again informed her mother that the defendant had assaulted her. The victim testified that she and her mother were having an argument and that she told her mother "what was bothering [her] at the moment." At trial, the victim could not remember exactly what she said at that time, but she "generally" related that her uncle had "touched" her. Following this disclosure, the victim's father took her to the police station, where she reported the events in question.

 The defendant denied the allegations and presented a robust defense. He attempted to establish that the victim and her parents had fabricated the allegations because he owed the family money. The defendant testified at trial and explained that, like the victim's parents, he was born in Brazil and that he came to the United States in 2008. He claimed that the victim's father, whom he knew in Brazil, paid for the trip, which cost $13,000. The defendant worked two jobs and repaid the loan. The defendant stated that years later, in August 2016, the father told the defendant that he wanted to be paid interest on the loan. Soon thereafter, the father said he wanted $6,000 for the defendant's "ex-partner" and her daughter, who were still living in Brazil. According to the defendant, when he refused to pay, the victim's father threatened to have him deported. The defendant also sought to undermine the victim's credibility by suggesting she had falsely accused her parents of physically abusing her and by emphasizing that she had accused an "uncle" of abusing her and he, unlike the other men who resided in the household, was not the victim's uncle.

 Page 693 

 Discussion. 1. Evidence of the defendant's immigration status. Prior to trial, defense counsel filed a motion in limine seeking to question the victim's parents about the debt ($13,000 loan plus interest) the defendant allegedly owed them. [Note 4] As noted, defense counsel intended to use this outstanding obligation to establish that the victim and her family had a motive to fabricate the allegations. The judge addressed the motion before empanelling a jury and ruled that counsel could pursue this line of questioning. In response, the prosecutor explained to the trial judge that this was brand new information that she was hearing of and that she did not want to "bring up immigration issues if [it wasn't] needed." Defense counsel then clarified that he would not discuss the details of how the defendant entered the country and that he would limit his questioning to the existence of the loan and unpaid interest.

 However, the defendant's testimony on direct examination exceeded the parameters proposed by defense counsel. As we have described, the defendant testified that he was from Brazil and that the victim's father paid for him to come to the United States and later had threatened to have the defendant deported if he could not pay his debt. The defendant stated twice that the victim's father "said that if I didn't pay, he would have me deported." Thereafter, during her cross-examination, the prosecutor asked the defendant whether he was in the country legally. She inquired: "And it's fair to say that you're here illegally in the [United States]?" The trial judge overruled defense counsel's objection to the question, and the defendant answered, "Yes." On redirect examination, the defendant testified that he was in the process of "being documented" and that the documentation was on hold pending the outcome of the case.

 Immediately after the defendant's testimony concluded, the judge instructed the jury, without objection, as follows:

"Now, ladies and gentlemen, I want to be absolutely and abundantly clear. The charges before the [c]ourt have nothing, nothing to do with whether the defendant is undocumented or documented, or in this country illegally, or in this country legally. That has nothing to do with these charges. You must determine these charges based upon the evidence, and the Commonwealth has the burden of proof, proof 

 Page 694 

beyond a reasonable doubt. So, the only thing you are to take into consideration when determining the defendant's guilt or innocence is whether the Commonwealth has proven its case against the defendant, and has proven each and every element of the crimes before the [c]ourt beyond a reasonable doubt. His documented or undocumented status in the United States is irrelevant."

 The defendant claims that the evidence of his immigration status was not only inadmissible but also so prejudicial that it deprived him of a fair trial. The Commonwealth asserts that the inquiry did not amount to an appeal to possible prejudice against undocumented immigrants, as the defendant asserts, but instead was a proper response to a subject raised by the defendant during his direct examination. The Commonwealth also notes that the prosecutor did not dwell on the defendant's immigration status, and the judge's limiting instruction cured any potential error. [Note 5] Because the issue is preserved, we review for prejudicial error. See Commonwealth v. Imbert, 479 Mass. 575, 579 (2018).

 We conclude that in this instance it was improper for the prosecutor to question the defendant about his immigration status. To be admissible at trial, evidence must be relevant, that is, it must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Commonwealth v. Buzzell, 79 Mass. App. Ct. 460 , 462 (2011), quoting Mass. G. Evid. § 401 (2011). Here, the question whether the defendant resided in the United States illegally had no bearing on whether he committed the sexual assaults, and therefore, defense counsel's objection should have been sustained. See Buzzell, supra (no fact in dispute that "becomes more or less probable depending on the [witness's] immigration status" and "no reason to believe that the fact that [a] witness[] may not [be] legally resid[ing] in this country ma[kes] them any less likely to be truthful").

 The question remains whether the improper admission of this evidence requires a new trial. "An error is not prejudicial if it 'did not influence the jury, or had but slight effect'; however, if we 

 Page 695 

cannot find 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error,' then it is prejudicial." Commonwealth v. Misquina, 82 Mass. App. Ct. 204, 207 (2012), quoting Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).

 The error was nonprejudicial for several reasons. First, the jury could have reasonably inferred that the defendant's immigration status was in question based on his testimony that the victim's father threatened to have him deported. The implication of such a threat is that the defendant was -- in fact -- subject to deportation. Although we do not expect jurors to be familiar with the intricacies of immigration law, it is within the common knowledge of an average juror that persons who reside lawfully in the United States are generally not subject to deportation, whereas those who reside in the country illegally may be deported. To be sure, there are many reasons why an individual can be deported, but an average juror would likely know that owing interest on a loan from a quasi family member is not one of them. Thus, while we do not agree with the Commonwealth's assertion that the defendant opened the door to an inquiry regarding his immigration status, the prejudicial impact of the prosecutor's question was mitigated by the fact that the jury, based on the defendant's testimony, already had more than an inkling that the defendant was living in the country illegally.

 Second, and more significantly, the judge gave a forceful limiting instruction, which we presume the jury understood and followed. See Commonwealth v. Donahue, 430 Mass. 710, 718 (2000) (because appellate courts presume that jury understands and follows limiting instructions, instructions typically "render[] any potentially prejudicial evidence harmless").

 Third, the jurors themselves indicated that they were not prejudiced against the defendant due to his immigration status, because they acquitted him on the charge of threat to commit a crime. See Commonwealth v. Rock, 429 Mass. 609, 616 (1999) (acquittal on one charge showed that jury were not swayed by emotion). The case boiled down to a determination of credibility, and the split verdict indicates that the jurors were able to impartially assess the credibility of the witnesses.

 And fourth, the issue was not raised with other witnesses or mentioned in the prosecutor's opening statement or closing argument. For these reasons, the error was not prejudicial. See 

 Page 696 

United States v. Diaz, 494 F.3d 221, 227 (1st Cir. 2007) (no need for mistrial after improper cross-examination about immigration status given strength of evidence and "isolated nature of the offending remark"); Misquina, 82 Mass. App. Ct. at 207.

 2. Questions about the defendant's ability to speak English. Next, the defendant argues that the Commonwealth improperly asked him about his ability to speak English and that this too was inflammatory because it appealed to the jury's bias against persons who live in the United States and do not speak the English language. The issue arose as follows: at one point during cross-examination, the prosecutor asked the defendant, "Mr. Santana, fair to say that you understand English?" to which the defendant replied, "No," and then confirmed in response to a follow-up question that he could not speak "any English." The prosecutor then attempted to show that, contrary to the defendant's assertion, he did speak English, and she asked him whether he had said "good morning" when he walked into the court room that day. The defendant admitted that he had but commented that he had been in the country for ten years and that it was "impossible that [he] wouldn't be able to say at least good morning." The prosecutor returned to this line of questioning later on, asking, "[a]nd you stated that you don't know any English, even the ten years you've been here?"; "you said that you don't understand English?"; and "you don't speak English?" [Note 6] Because there was no objection, we apply the substantial risk of a miscarriage of justice standard of review. See Commonwealth v. Alphas, 430 Mass. 8, 13 (1999).

 As an initial matter, we note that the prosecutor's question was not directed to the defendant's "inability" to speak the English language as the defendant now claims. Rather, she questioned his assertion that he could not speak the language and implied that in fact he could speak English. In any event, we recognize that there may well be bias toward non-English speakers generally, see Commonwealth v. Espinal, 482 Mass. 190, 198 (2019), and thus it would have been better had the prosecutor not drawn attention to the issue of the defendant's command of the language. Nonetheless, there was no substantial risk that any language-related bias created a miscarriage of justice here, where two of the prosecution's key witnesses -- the victim's parents -- had 

 Page 697 

resided in the country longer than the defendant and also did not speak English. Indeed, both parents required the assistance of an interpreter throughout the trial, and neither witness could spell their name in English.

 3. Multiple first complaint testimony in violation of the first complaint doctrine. Detective Michael DeLuca, a sexual assault investigator assigned to the case, testified for the Commonwealth and detailed the various steps of the investigation. He testified that he notified the district attorney's office so that that office could arrange a forensic interview with the victim, interviewed the victim's parents, identified the defendant as the suspect, and then obtained an arrest warrant. [Note 7] The defendant now contends that DeLuca's testimony violated the first complaint doctrine. See Commonwealth v. King, 445 Mass. 217, 218-219 (2005), cert. denied, 546 U.S. 1216 (2006). As defense counsel did not object to DeLuca's testimony, we review for a substantial risk of a miscarriage of justice. See Alphas, 430 Mass. at 13.

 "Testimony detailing an investigation" is typically not allowed under the first complaint doctrine "unless it is from the first complaint witness or in response to a defense theory." [Note 8] Espinal, 482 Mass. at 202, quoting Commonwealth v. McCoy, 456 Mass. 838, 847 (2010). As the Supreme Judicial Court explained in Commonwealth v. Stuckich, 450 Mass. 449, 457 (2008), such testimony "creates the imprimatur of official belief in the complainant" and is "unnecessary and irrelevant to the issue of the defendant's guilt." [Note 9] See Commonwealth v. Hanino, 82 Mass. App. Ct. 489, 495-496 (2012).

 In view of Stuckich, we agree with the defendant that DeLuca's testimony describing the steps he took in the investigation was improper. We part ways with the defendant's analysis in that the error did not create a substantial risk of a miscarriage of justice. See Alphas, 430 Mass. at 13.

 The detective did not express any indication that he believed the victim. Moreover, the defendant benefited from cross-examining 

 Page 698 

DeLuca to argue that his investigation was inadequate, as he failed to interview numerous individuals, including the defendant, the defendant's girlfriend, and the other men who lived with the victim to whom she also referred as her uncles. See McCoy, 456 Mass. at 852 (any error in admitting detective's testimony in violation of first complaint doctrine was "overcome by the benefits [the defendant] received on cross-examination").

 4. Alleged exclusion of evidence regarding the victim's mental health history. Prior to trial, defense counsel informed the judge that the victim had a history of trauma and had attempted suicide and been hospitalized on several occasions. He sought to introduce testimony about the impact of the victim's psychiatric history on her memory. To do so, he proposed to present testimony from an investigator with the Department of Children and Families (DCF), who was familiar with the victim's mental health history as a result of her participation in a prior DCF investigation into allegations that the victim's parents had physically abused her. The judge ruled that testimony regarding the victim's mental health and DCF's investigation was admissible but that the investigator could not testify as an expert psychologist. Ultimately, although defense counsel had served a subpoena on the DCF investigator, he decided not to present her testimony. As he explained to the judge during a sidebar conference, "[A]t this time, I don't even believe based upon what I've heard from any of the witnesses here today, that I even have to go to that extent."

 The defendant now argues that the judge improperly ruled that the DCF investigator could not testify as an expert witness. Passing on the issue whether the judge abused his considerable discretion, and we think he did not, the defendant made a strategic decision not to call the investigator as a witness, and her absence was not the result of the judge's ruling. Accordingly, there was no error.

 5. Claim of improper remark in the prosecutor's summation. The defendant claims that the prosecutor committed prejudicial error when, in her closing argument, she reminded the jury that the police obtained an arrest warrant at the conclusion of the investigation. The prosecutor stated:

"[T]here is no physical evidence of these things because the defendant was keeping the secret with [the victim] . . . . [B]ut all that changed when law enforcement became involved in 2017, when [a police officer] took that walk-in report, and 

 Page 699 

that was referred to the Sexual Assault Unit and Sergeant Detective DeLuca, with about five years of experience as a detective investigated those things, and as a result of those, sought an arrest warrant."

Although he did not object, the defendant now argues that the remark improperly vouched for the victim's credibility by suggesting that an arrest warrant was sought because the police believed in the truth of her allegations. [Note 10] 

 This argument should not have been made. See Commonwealth v. Caillot, 454 Mass. 245, 259 (2009) ("A prosecutor engages in improper vouching if he expresses a personal belief in the credibility of a witness, or indicates that he . . . has knowledge independent of the evidence before the jury" [quotation and citation omitted]). In addition to potentially influencing the jury's assessment of the victim's credibility, as the defendant correctly states, the argument had the potential to draw the jury's attention to Detective Deluca's testimony regarding the investigation, the admission of which was questionable under Stuckich, 450 Mass. at 457. Furthermore, during their deliberations, the jury sent a note to the judge asking about the requirements for obtaining an arrest warrant, thereby indicating, possibly, that the argument raised an issue the jury should not consider.

 Nevertheless, after taking into account the absence of an objection, the judge's cautionary instructions regarding closing argument, the emphatic and forceful instruction given in response to the jury's question, [Note 11] and the fact that the jury did not convict the defendant of all the charges, we conclude that when measured 

 Page 700 

against the standard of a substantial risk of a miscarriage of justice, the challenged portion of the argument does not require reversal of the convictions.

 Judgments affirmed.

 RUBIN, J. (dissenting). On June 16, 2015, Donald Trump rode down an escalator at Trump Tower in Manhattan and said,

"[w]hen Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people . . . It's coming from more than Mexico. It's coming from all over South and Latin America."

Centro Presente v. United States Dep't of Homeland Sec., 332 F. Supp. 3d 393, 400-401 (D. Mass. 2018) (quoting this language).

 These are perhaps the most famous words Trump has ever uttered. They were spoken at the launch of his presidential campaign. That these would be the words with which a candidate launched a successful campaign for the presidency is but one indication of what we all know: Prejudice against undocumented Latin Americans is powerful and widespread in the United States.

 The defendant is from Brazil and does not speak English. His immigration status is no more relevant to his guilt or innocence of the crimes with which he was charged than his race or religion. Yet at his trial on charges of indecent assault and battery, the prosecutor asked the defendant, "And it's fair to say that you're here illegally in the [United States]?" The trial judge overruled defense counsel's objection to this inquiry, and the defendant answered, "Yes."

 As the majority concludes, the judge's ruling was clearly in error. The question and answer were irrelevant. The Commonwealth argues that the defendant "opened the door" to cross-examination on the issue by saying that the father of the alleged victim threatened to have him deported. But, as the majority properly concludes, the defendant's testimony did no such thing. The testimony elicited by the prosecutor did not undermine the 

 Page 701 

defendant's testimony. It could have benefited the Commonwealth in only one way: as an appeal to the prejudice of the jurors.

 The Commonwealth argues, however, that the error does not require a new trial because it was not prejudicial. As this was a preserved claim of error, the burden is on the Commonwealth to "convince[] [the appellate court] that the error did not influence the jury, or had but very slight effect" (citation omitted). Commonwealth v. Steeves, 490 Mass. 270, 289 (2022).

 The majority agrees with the Commonwealth that the error was not prejudicial. The primary argument put forward by the Commonwealth is that any error was not prejudicial because, after the testimony of the defendant, the judge, who did not strike the answer or instruct the jury to disregard it, instructed:

"Now, ladies and gentlemen, I want to be absolutely and abundantly clear. The charges before the [c]ourt have nothing, nothing to do with whether the defendant is undocumented or documented, or in this country illegally, or in this country legally. That has nothing whatsoever to do with these charges. You must determine these charges based upon the evidence, and the Commonwealth has the burden of proof, proof beyond a reasonable doubt. So, the only thing you are to take into consideration when determining the defendant's guilt or innocence is whether the Commonwealth has proven its case against the defendant, and has proven each and every element of the crimes before the [c]ourt beyond a reasonable doubt. His documented or undocumented status in the United States is irrelevant."

The majority relies largely on this in its decision, calling it "significant[]," and "a forceful limiting instruction." Ante at 695.

 But because of the nature of prejudice against unlawful immigrants, this instruction was inadequate to cure the error. To see why this is so, just imagine a prosecutor was permitted over objection needlessly to ask a Jewish defendant, "And it's fair to say you're a Jew?" to which the defendant replied in the affirmative. Surely a parallel instruction from the judge including the statement that "the charges before the court have nothing, nothing to do with whether the defendant is a Jew or not," would be insufficient to cure the error and eliminate the risk that prejudice might infect a juror's deliberation. Without the judge's instruction in this case, no one could reasonably say that this error was not prejudicial, so this really is the heart of the matter.

 Page 702 

 Beyond the judge's instruction, the majority does add several makeweights to the explanation for its conclusion that the error was not prejudicial. It says first, in an argument not raised by the Commonwealth, one that the majority acknowledges is less significant, that "the jury could have reasonably inferred that the defendant's immigration status was in question based on his testimony that the victim's father threatened to have him deported." Ante at 695.

 But surely the testimony that the defendant was in the country illegally would not be rendered less prejudicial because earlier testimony may have left the jurors wondering about the question. If the jury had the mistaken belief that the defendant's immigration status was "in question" in the case, the prosecutor's provision of the answer that the defendant was here unlawfully was at least and possibly more prejudicial than it otherwise would have been. Again, that a jury were wondering if a defendant was a Jew -- indeed, that they had a mistaken belief that the matter was in question in the case -- would not render nonprejudicial a question eliciting proof that he was.

 Nor, although I suppose the jurors might have wondered about the defendant's status based on his testimony, can I agree with the majority about the implication of the threat to have the defendant deported. The majority says, "The implication of such a threat is that the defendant was -- in fact -- subject to deportation. Although we do not expect jurors to be familiar with the intricacies of immigration law, it is within the common knowledge of an average juror that persons who reside lawfully in the United States are generally not subject to deportation, whereas those who reside in the country illegally may be deported." Ante at 695.

 But as even a lay person must know, the danger involved in a threat to contact immigration officials in order to have an immigrant deported obviously does not depend on his or her actual deportability. That is part of the power of the threat. Further, as the majority is well aware, lawful presence in the United States, even lawful residence, does not protect one from deportation. The volumes of the Massachusetts Reports are littered with decisions about the deportation even of lawful permanent residents, who may be rendered deportable by conviction of any of myriad crimes. See, e.g., Commonwealth v. Petit-Homme, 482 Mass. 775, 775-776 (2019); Commonwealth v. Lys, 481 Mass. 1, 2 (2018); Commonwealth v. DeJesus, 468 Mass. 174, 179 (2014). We hear cases involving such immigrants every month. Indeed, 

 Page 703 

even an allegation of crime may lead to prolonged detention by Immigration and Customs Enforcement, even of immigrants who make bail. See Graber & Schnitzer, The Bail Reform Act and Release From Criminal and Immigration Custody for Federal Criminal Defendants 1, National Immigration Project of the National Lawyers Guild (June 2013) ("noncitizen defendants who do make bail are often transferred to immigration custody instead of being released. This practice is so common that some noncitizens do not seek bail because they fear such a transfer").

 The majority also notes, as does the Commonwealth, that the defendant was not convicted on all counts. He was, however, convicted on all three counts of indecent assault and battery, although not on the single count of threat to commit a crime, submitted to the jury. Of course we are unable to go behind the verdicts to determine what this split verdict represents, but given the nature of the improper evidence and the convictions here, the one acquittal does not suffice to show an absence of prejudice.

 Finally, the majority says that the issue was not raised with other witnesses or mentioned in the prosecutor's opening or closing argument, and calls it an "isolated . . . remark." Ante at 696, quoting United States v. Diaz, 494 F.3d 221, 227 (1st Cir. 2007). But, again, as with the hypothesized testimony elicited from a defendant that he is a Jew, the jury do not need more than one piece of evidence demonstrating the irrelevant point that the defendant is an immigrant in the country illegally in order for the prejudicial message to be delivered.

 And in fact, in this case, the evidence was not isolated. There were also several unobjected-to questions from the prosecutor about the defendant's ability to speak English. Indeed, some of them led up to the question about the defendant's illegal status:

Q: "So, going back to my questions prior, you said that you don't understand English?"

A: "No. I would like to. I don't understand."

Q: "And you don't speak English?"

A: "No."

Q: "Where were you born, originally?"

A: "Brazil."

Q: "And it's fair to say that you're here illegally in the US?"

 Page 704 

 The questions about speaking English implied that the defendant was falsely hiding behind a feigned inability to speak English. This was impeachment of a type that the majority recognizes may cause "bias toward non-English speakers," ante at 696, and it obviously dovetails with the idea that immigrants, particularly the undocumented, are criminals not to be trusted. The fact that some of the Commonwealth's witnesses, who were themselves not defendants, also were not English speakers, something referred to by the majority, ante at 696-697, does nothing to diminish the prejudice.

 In light of this, the prejudice from the improperly adduced evidence that the defendant was in the country illegally is clear.

 It goes without saying that one would not lightly order a new trial in a case like this in which retrial will require the now twenty-one year old complainant to testify again about terrible sex crimes of which she is alleged to have been a victim while a child. I certainly would not.

 But because of the risk of prejudice caused by the prosecutor's needless and erroneous decision to introduce into these criminal proceedings the defendant's status as an undocumented immigrant present unlawfully in the United States, particularly in a context in which the prosecutor also repeatedly implied the defendant was falsely pretending not to understand English, the defendant's convictions must be vacated and the case remanded for a new trial. I therefore respectfully dissent.

FOOTNOTES
[Note 1] The judge allowed the defendant's motion for a required finding of not guilty on a fourth count of indecent assault and battery, and the jury found the defendant not guilty on an additional charge of threat to commit a crime. 

[Note 2] There was conflicting testimony regarding the number of relatives who lived in the home at the time the events in question occurred. The victim testified that the defendant and one other uncle resided in the home. The victim's father testified that two of his brothers-in-law and the defendant lived in the home, and the defendant testified that at times he and three male relatives lived with the family. 

[Note 3] The victim testified that she never told anybody, including the police, about this third incident because it was "too rough to speak of." 

[Note 4] The victim's father denied that he had asked for interest on the loan and testified that there was no debt at the time of trial. 

[Note 5] Given the concern expressed by the prosecutor regarding immigration issues during the hearing on the motion in limine, we do not believe, as the defendant suggests, that she intentionally elicited the defendant's immigration status to obtain a guilty verdict. Nonetheless, regardless of intent, the question should not have been asked, and the objection should have been sustained. 

[Note 6] The defendant replied "no" to the latter two questions. He did not respond to the first question, as defense counsel requested a sidebar on a different matter before the defendant could answer. 

[Note 7] In response to the prosecutor's question, DeLuca stated that he obtained an arrest warrant "as a result of the interviews" conducted. 

[Note 8] The victim's mother testified as the first complaint witness in this case. 

[Note 9] Of course, the court's holding in Stuckich did not "imply that, unless a police officer is the first complaint witness, testimony concerning the circumstances giving rise to the police involvement in a sexual assault case will never be admissible as part of the Commonwealth's case-in-chief" where it has relevance apart from first complaint purposes. Commonwealth v. Arana, 453 Mass. 214, 226 (2009). 

[Note 10] The defendant does not argue that the detective's testimony that he obtained an arrest warrant was improperly admitted, and so we do not pass upon that issue. See Commonwealth v. Telcinord, 94 Mass. App. Ct. 232, 242-243 (2018) (no substantial risk of miscarriage of justice arose from police testimony about arrest of defendant, where defense attacked adequacy of police investigation, and thus placed arrest at issue). 

[Note 11] The judge instructed the jury: 

"[T]he facts in this matter show that an arrest warrant was issued, but what you have to concentrate and what your task is to determine whether the Commonwealth has proven the charges against the defendant beyond a reasonable doubt. The facts, as each one of you heard, you're going to have to determine based upon those facts and the law that you heard from the Court whether the Commonwealth has proven the charges beyond a reasonable doubt. As far as the arrest warrant, the evidence has shown that that was issued and that's enough. You have to go on to determine whether the Commonwealth has proven each and every charge against the defendant, and proven each and every element of those charges against the defendant beyond a reasonable doubt."

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.